**2024-1523; 2024-1525**

# United States Court of Appeals for the Federal Circuit

DYNAMITE MARKETING, INC.,

*Plaintiff-Appellee,*

— v. —

THE WOWLINE, INC., SHERMAN SPECIALTY LLC,
SHERMAN SPECIALTY, INC,

*Defendants-Appellants,*

WWW.SUPERIORPROMOS.COM, WWW.USIMPRINTS.COM,
WWW.4ALLPROMOS.COM, UNKNOWN WEBSITES 1-10,
VARIOUS JOHN DOES 1-10, UNKNOWN ENTITIES 1-10,

*Defendants.*

---

DYNAMITE MARKETING, INC.,

*Plaintiff,*

— v. —

4TH DIMENSON INNOVATIONS, INC., by and through
its former officer LaErik Cooper, LAERIK COOPER,

*Defendants.*

*On Appeal from the United States District Court for the Eastern
District of New York in No. 2:19-cv-03067-GRB-LGD*

## BRIEF FOR DEFENDANTS-APPELLANTS

JEFFREY L. SNOW
JOSEPH V. MICALI
PRYOR CASHMAN LLP
Seven Times Square, 40th Floor
New York, New York 10036
(212) 421-4100
jsnow@pryorcashman.com
jmicali@pryorcashman.com
*Counsel for Defendants-Appellants*

April 29, 2024

**U.S. Design Patent D751,877, Claim (Appx28)**



**FIG. 2**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1523 |
| **Short Case Caption** | Dynamite Marketing, Inc. v. The WowLine, Inc. |
| **Filing Party/Entity** | The WowLine, Inc., Sherman Specialty, Inc., and Sherman Specialty LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/12/2024

Signature: /s/ Jeffrey L. Snow

Name: Jeffrey L. Snow

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| The WowLine, Inc. | | |
| Sherman Specialty, Inc. | | |
| Sherman Specialty LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable      ☑   Additional pages attached

| | | |
|---|---|---|
| Sergei Orel, Gearhart Law, LLC | Andrew Cooper, Mohen Cooper LLC | Kenneth Kast, Mohen Cooper LLC |
| Michael Cukor, McGeary Cukor LLC | John Donohue, Jr., Falcon Rappaport & Berkman PLLC | Steven Berlowitz, Falcon Rappaport & Berkman PLLC |
| Vincent McGeary, McGeary Cukor LLC | David Dehoney, Michelman & Robinson LLP | Ashley Moore, Michelman & Robinson LLP |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable      ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## Addendum to Response to Entry 4 "Legal Representatives"

Jon Gibbs, Lowndes, Drosdick, Doster, Kantor & Reed, P.A.

Todd Soloway, Pryor Cashman LLP

Jeffrey Snow, Pryor Cashman LLP

Joseph Micali, Pryor Cashman LLP

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF RELATED CASES .................................... ix

STATEMENT OF JURISDICTION ........................................ 1

STATEMENT OF THE ISSUES ............................................ 2

STATEMENT OF THE CASE ................................................ 4

STATEMENT OF THE FACTS ............................................. 5

    I.    Dynamite and the D'877 Patent ................................. 5

    II.   Sherman and the Accused Product ........................... 8

SUMMARY OF THE ARGUMENT ..................................... 10

ARGUMENT .................................................................... 12

    I.    Statement of the Standard of Review and Legal Standards for Issues Raised on Appeal ......................................... 12

        A.    Standard of Review ..................................... 12

        B.    Legal Standards for Issues on Appeal ........... 13

            1.    Inventorship and Standing ................... 13

            2.    Non-Infringement ................................ 15

            3.    Invalidity .......................................... 15

                a.    Functionality ........................... 16

                b.    Obviousness ............................ 16

            4.    Damages ........................................... 17

            5.    Attorney's Fees and Costs .................... 18

II.    The District Court's Determination That Cooper Is Not a Co-Inventor Should Be Overturned .......................................................... 18

    A.    The District Court's Submission of the Inventorship Claim to the Jury Was Erroneous For Lack of Jury Trial Right ............................................................................. 18

    B.    The Jury's Verdict on Inventorship Should Be Set Aside for Lack of Substantial Evidence .................................... 23

III.    The Jury's Verdict on Infringement Is Not Supported By Substantial Evidence ......................................................................... 30

IV.    The Jury's Verdict of No Functionality Is Not Supported By Substantial Evidence ......................................................................... 35

V.    The Jury's Verdict of No Obviousness Is Not Supported By Substantial Evidence ......................................................................... 39

VI.    The Jury's Verdict on Damages Is Not Supported By Substantial Evidence and Is Based on Inadmissible Evidence .......... 43

    A.    There Is Insufficient Evidence on the Absence of Acceptable Non-Infringing Substitutes to Support the Jury's Verdict ............................................................... 44

    B.    There Is Insufficient Evidence on the Demand for the Patented Product to Support the Jury's Verdict ....................... 51

    C.    The Jury Charge and Jury Award Failed to Differentiate Between the Key Time Periods for Damages ...................................................................... 56

VII.    The District Court's Award of Attorney's Fees and Other Fees and Costs Should Be Set Aside .................................................. 57

    A.    The District Court's Findings Directed to Enhanced Damages Are Irrelevant and Inapplicable ................................. 57

    B.    Award of Attorney's Fees and Other Fees and Costs to Dynamite Should Be Set Aside As Erroneous and an Abuse of Discretion ................................................................. 58

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................. 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbvie Inc. v. Mathilda & Terrence Kennedy Inst. of Rheumatology Trust*,
    764 F.3d 1366 (Fed. Cir. 2014) ....................................................15

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010) ....................................................56

*Advanced Video Techs. LLC v. HTC Corp.*,
    879 F.3d 1314 (Fed. Cir. 2018) .............................................. 15, 29

*Alps South, LLC v. Ohio Willow Wood Co.*,
    787 F.3d 1379 (Fed. Cir. 2015) ....................................................29

*Arachnid, Inc. v. Merit Indus.*,
    939 F.2d 1574 (Fed. Cir. 1991) ....................................................56

*BIC Leisure Prods. v. Windsurfing Int'l*,
    1 F.3d 1214 (Fed. Cir. 1993) .......................................................55

*Blue Gentian, LLC v. Tristar Prods., Inc.*,
    70 F.4th 1351 (Fed. Cir. 2023) ....................................................13

*Cameron v. City of New York*,
    598 F.3d 50 (2d Cir. 2010) ..........................................................12

*Campbell Soup Co. v. Gamon Plus, Inc.*,
    939 F.3d 1335 (Fed. Cir. 2019) ....................................................41

*Central Soya Co. v. Geo. A. Hormel & Co.*,
    723 F.2d 1573 (Fed. Cir. 1983) ....................................................59

*Contessa Food Prods., Inc. v. Conagra, Inc.*,
    282 F.3d 1370 (Fed. Cir. 2002) ....................................................15

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962).....................................................................21

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co., Ltd.*,
    964 F.3d 1365 (Fed. Cir. 2020) ....................................................14

*Datascope Corp. v. SMEC, Inc.*,
    879 F.2d 820 (Fed. Cir. 1989) .....................................................44

iii

*Delta T, LLC v. Dan's Fan City, Inc.*,
  2021 U.S. Dist. LEXIS 24422, 2021 WL 458022
  (M.D. Fla. Feb. 9, 2021) ..................................................................33

*Dobson v. Dornan*,
  118 U.S. 10 (1886).......................................................... 45, 51, 55

*Dobson v. Hartford Carpet Co.*,
  114 U.S. 439 (1885)............................................................... 45, 51

*Drone Techs., Inc. v. Parrot S.A.*,
  838 F.3d 1283 (Fed. Cir. 2016) .....................................................21

*DSU Med. Corp. v. JMS Co., Ltd.*,
  471 F.3d 1293 (Fed. Cir. 2006) .....................................................54

*Durling v. Spectrum Furniture Co.*,
  101 F.3d 100 (Fed. Cir. 1996) ................................. 16, 17, 40, 42

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
  543 F.3d 665 (Fed. Cir. 2008) ................................... 15, 30, 34

*Eli Lilly & Co. v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004) ....................................................13

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312  (Fed. Cir. 2015) ............................................ 36, 37

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) ............................................ *passim*

*EZ Dock, Inc. v. Schafer Sys., Inc.*,
  No. 98-2364, 2003 U.S. Dist. LEXIS 3634 (D. Minn. Mar. 8, 2003)...........50

*Fina Oil & Chem. Co. v. Ewen*,
  123 F.3d 1466 (Fed. Cir. 1997) ...................................... 13, 26, 27

*Fina Tech., Inc. v. Ewen*,
  265 F.3d 1325 (Fed. Cir. 2001) ....................................................13

*Finalrod IP, LLC v. Endurance Lift Sols., Inc.*,
  No. 20-00189, 2021 U.S. Dist. LEXIS 2026819
  (E.D. Tex. Oct. 20, 2021) ..............................................................50

*Geigtech E. Bay LLC v. Lutron Elecs. Co.*,
  No. 18-5290, 2023 U.S. Dist. LEXIS 184989
  (S.D.N.Y. Sep. 20, 2023)...............................................................34

iv

*Grain Processing Corp. v. American Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ........................................ 44, 45, 54

*Group One Ltd. v. GTE GmbH*,
  625 F. Supp. 3d 28 (E.D.N.Y. 2022) .............................................44

*Hafco Foundry & Mach. Co. v. GMS Mine Repair & Maint., Inc.*,
  No. 15-16143, 2018 U.S. Dist. LEXIS 106291
  (S.D.W. Va. June 26, 2018) .................................................. 43, 46

*High Point Design LLC v. Buyer's Direct, Inc.*,
  730 F.3d 1301 (Fed. Cir. 2013) .................................................16

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  687 F.3d 1300 (Fed. Cir. 2012), *vacated on other grounds*,
  134 S. Ct. 1744 (2014).................................................................59

*In re VerHoef*,
  888 F.3d 1362 (Fed. Cir. 2018) .................................................14

*Induction Innovations, Inc. v. Pacholok*,
  No. 13-5102, 2014 U.S. Dist. LEXIS 137580
  (N.D. Ill. Sept. 30, 2014) .........................................................29

*Israel Bio-Engineering Project v. Amgen, Inc.*,
  475 F.3d 1256 (Fed. Cir. 2007) ........................................... 14, 29

*Kimberly-Clark Corp. v. The Procter & Gamble Distrib. Co., Inc.*,
  973 F.2d 911 (Fed. Cir. 1992) ...................................................13

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)...................................................................42

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ........................................... 16, 39

*Lambland, Inc. v. Heartland Biogas, LLC*,
  No. 22-1184, 2023 U.S. App. LEXIS 31726
  (10th Cir. Nov. 30, 2023) .........................................................54

*Litton Sys., Inc. v. Honeywell, Inc.*,
  87 F.3d 1559 (Fed. Cir. 1996) ...................................................52

*LKQ Corp. v. GM Glob. Tech. Ops. LLC*,
  No. 21-2348 (Fed. Cir. June 30, 2023).......................................42

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
   925 F.3d 1225 (Fed. Cir. 2019) ....................................................29

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ....................................................17

*Lumen View Technology LLC v. Findthebest.com, Inc.*,
   811 F.3d 479 (Fed. Cir. 2016) ......................................................59

*Manganiello v. City of New York*,
   612 F.3d 149 (2d Cir. 2010) .........................................................13

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
   337 F.3d 1362 (Fed. Cir. 2003) ....................................................18

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
   851 F.3d 1275 (Fed. Cir. 2017) ....................................................45

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) .........................................................12

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996) ............................................... 52, 54

*OraLabs, Inc. v. Kind Grp. LLC*,
   No. 13-00170, 2015 U.S. Dist. LEXIS 103864
   (D. Colo. Aug. 7, 2015) ................................................................32

*Pacific Life Ins. Co. v. The Bank of N.Y. Mellon*,
   571 F. Supp. 3d 106 (S.D.N.Y. 2021) .................................... 50, 53

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
   320 F.3d 1354 (Fed. Cir. 2003) ....................................................21

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
   575 F.2d 1152 (6th Cir. 1978) ............................................ *passim*

*Perkin-Elmer Corp. v. Computervision Corp.*,
   732 F.2d 888 (Fed. Cir. 1984) ......................................................12

*Presidio Components, Inc. v. American Tech. Ceramics Corp.*,
   875 F.3d 1369 (Fed. Cir. 2017) ....................................................61

*Prima Tek II, L.L.C. v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) ....................................................14

*Rambus Inc. v. Infineon Techs. AG,*
    318 F.3d 1081 (Fed. Cir. 2003) ....................................59

*Raytheon Co. v. Indigo Sys. Corp.,*
    895 F.3d 1333 (Fed. Cir. 2018) ....................................12

*Rembrandt Techs., LP v. Comcast of Fla./Pa., LP,*
    899 F.3d 1254 (Fed. Cir. 2018) ................................59, 62

*Richardson v. Stanley Works, Inc.,*
    597 F.3d 1288 (Fed. Cir. 2010) ............................... 16, 39

*Riles v. Shell Expl. Prod. Co.,*
    298 F.3d 1302 (Fed. Cir. 2002) ....................................54

*Rosco, Inc. v. Mirror Lite Co.,*
    304 F.3d 1373 (Fed. Cir. 2002) ............................... 16, 37

*Rosco, Inc. v. Mirror Lite Co.,*
    626 F. Supp. 2d 319 (E.D.N.Y. 2009) ...................... 17, 44, 48

*Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.,*
    264 F.3d 1344 (Fed. Cir. 2001) ....................................14

*Shum v. Intel Corp.,*
    499 F.3d 1272 (Fed. Cir. 2007) ............................... 20, 21

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,*
    637 F.3d 1269 (Fed. Cir. 2011) ....................................17

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,*
    926 F.2d 1161 (Fed. Cir. 1991) ....................................53

*Spectralytics, Inc. v. Cordis Corp.,*
    649 F.3d 1336 (Fed. Cir. 2011) ....................................59

*Spineology, Inc. v. Wright Med. Tech., Inc.,*
    910 F.3d 1227 (Fed. Cir. 2018) ....................................18

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
    14 F.4th 1323 (Fed. Cir. 2021) ....................................60

*Tingley Sys., Inc. v. Norse Sys., Inc.,*
    49 F.3d 93 (2d Cir. 1995) ..................................... 17, 43

*United States v. Feliciano,*
    223 F.3d 102 (2d Cir. 2000) ........................................31

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) .........................................................................51

*WiAV Solutions LLC v. Motorola, Inc.*,
    631 F.3d 1257 (Fed. Cir. 2010) ....................................................29

*Yeti Coolers, LLC v. RTIC Coolers, LLC*,
    No. 15-597, 2017 U.S. Dist. LEXIS 11956
    (W.D. Tex. Jan. 29, 2017) ............................................................33

**Statutes & Other Authorities:**

U.S. Const. art. III, § 2 ..........................................................................28

28 U.S.C. § 1295(a)(1) ...........................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1338(a) ................................................................................1

35 U.S.C. § 256 ............................................................................. *passim*

35 U.S.C. § 284 ............................................................................. *passim*

35 U.S.C. § 285 .............................................................. 11, 18, 58, 59

35 U.S.C. § 287 .....................................................................................21

35 U.S.C. § 289 ............................................................................. 17, 43

Fed. R. Civ. P. 39(c)(1) .........................................................................19

Fed. R. Civ. P. 39(c)(2) .........................................................................19

Fed. R. Civ. P. 46 ..................................................................................19

Fed. R. Civ. P. 50(a) .............................................................................12

Fed. R. Evid. 701(c) ..............................................................................54

7 CHISUM ON PATENTS § 20.05[2][e][vi] (2023) ....................................55

## STATEMENT OF RELATED CASES

No other appeal in or from the same case in the district court was previously before this Court or any other appellate court.

Counsel for Defendants-Appellants The WowLine, Inc., Sherman Specialty, Inc., and Sherman Specialty LLC is not aware of any other cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court's jurisdiction over this case, involving claims of patent infringement, was based, *inter alia*, on 28 U.S.C. §§ 1331 and 1338(a).

Jurisdiction before the United States Court of Appeals for the Federal Circuit is proper pursuant to 28 U.S.C. § 1295(a)(1).

A Notice of Appeal was timely filed on December 26, 2023, following the court's entry of the December 1, 2023 Memorandum & Order and the December 19, 2023 Order on a permanent injunction. An Amended Notice of Appeal was timely filed on February 14, 2024, following entry of the January 22, 2024 final Judgment in the United States District Court for the Eastern District of New York.

## STATEMENT OF THE ISSUES

This case presents the following issues for review:

1.    Whether the district court erred in submitting the inventorship claim, which is a question of law, to the jury.

2.    Whether the jury's verdict should be set aside and the court erred in denying the motion for judgment as a matter of law ("JMOL") on inventorship, and whether the case should be dismissed as a matter of law for Appellee-Plaintiff's lack of standing if the purported co-inventor is determined to be an inventor.

3.    Whether the jury's verdict should be set aside and the court erred in denying the JMOL motion and motions for a new trial on infringement, including for exclusion of Appellants-Defendants' expert testimony on the ordinary observer.

4.    Whether the jury's verdict should be set aside and the court erred in denying the JMOL motion and motion for a new trial on invalidity for obviousness and functionality.

5.    Whether the jury's verdict should be set aside and the court erred in awarding lost profits damages and denying Appellants-Defendants' motion for remittitur or for a new trial on damages where (a) the only competent evidence presented failed to establish that (i) there were no acceptable non-infringing substitutes or (ii) there was demand for the patented product, under the four-factor

*Panduit* test, and (b) there was insufficient non-speculative evidence to quantify lost profits damages.

     6.     Whether the court erred and abused its discretion in granting Appellee-Plaintiff's motion for an award of attorney's fees.

## STATEMENT OF THE CASE

Appellee-Plaintiff Dynamite Marketing, Inc. ("Dynamite") brought a patent infringement claim, asserting U.S. Design Patent D751,877 ("the D'877 patent"), against Defendants-Appellants The WowLine, Inc., Sherman Specialty, Inc., and Sherman Specialty LLC (collectively, "Sherman") at a trial before the district court.[1]

The court conducted a bifurcated jury trial, submitting an inventorship claim along with ownership issues to the jury in the first phase, and then submitting the issues of infringement, invalidity, and damages to the jury in the second phase. Appx5.[2]  The jury returned two verdicts: the first that the purported co-inventor failed to prove he had made significant contributions to the claimed design, and the second that the patent was not invalid for obviousness or functionality, Sherman infringed the patent, the infringement was willful, and Dynamite proved damages of $1.85 million.  *Id.*

After trial, the defendants brought a motion for judgment as a matter of law ("JMOL") on the issues of inventorship and Dynamite's lack of standing, JMOL motions and motions for a new trial on infringement, invalidity for functionality

---

[1] The original complaint contained claims directed, *inter alia*, to trademark and trade dress infringement, but these claims were dropped before trial. Appx2673-74.

[2] References to pages in the Joint Appendix are abbreviated as Appx__.

4

and obviousness, and willfulness. Appx3. Sherman also brought a post-trial motion for JMOL, remittitur, or a new trial on damages. *Id.* Dynamite brought a motion for damages enhancement, attorney's fees and costs, interest, and a permanent injunction. *Id.* The issues of ownership, standing, or equitable estoppel relating to the inventorship claim were not reached in light of the first verdict. Appx9.

In a post-trial Memorandum (Appx1-19), the court denied all of Sherman's post-trial motions and granted Dynamite's motion for attorney's fees and a permanent injunction against Sherman. Sherman appeals the court's denials of the Defendants' JMOL motions and motions for a new trial, the jury's verdict, the court's orders in the post-trial Memorandum, and the Judgment entered thereon.

## STATEMENT OF THE FACTS

Sherman sets forth the factual background relevant to this appeal.

## I.    Dynamite and the D'877 Patent

The D'877 patent, which issued in the name of Dynamite's principal, Alex Shlaferman, relates to the design of a multi-purpose tool that Dynamite sells as a credit card-sized device under the name "Wallet Ninja."[3]  Appx26-30; Appx66.  In addition to features such a box cutter, letter opener, and screwdriver, the patent

---

[3] Dynamite later introduced a version called "Wallet Ninja Pro."  Appx6561; Appx6567.

design includes a series of hex-shaped cutouts along one edge of the tool in a mound shape.  Appx26-30; Appx5165-69.  The hex-shaped cutouts are designed to work on correspondingly sized hex-shaped nuts.  Appx5165.

At trial, Sherman identified several prior art multi-purpose tool designs.  The Pocket Monkey (below, left), which was covered by U.S. Patent D707,091 (Appx5922; Appx4204-05; Appx6621-26), has several utilitarian features, such as a box cutter and letter opener, but does not include hex-shaped cutouts along the edge.  Instead, the Pocket Monkey has an internal hole with nested cutouts.  The credit card-sized tool shown in U.S. Patent D603,230 ("the D'230 patent") (Appx4203; Appx6617-20) (below, right), includes hex-shaped cutouts along its edges.



POCKET MONKEY                    D'230 PATENT

Shlaferman used the Pocket Monkey to develop the Wallet Ninja.[4]

Appx4438-39 (sending image of Pocket Monkey, "[Shlaferman] wanted a tool like

_____

[4] Initially, Shlaferman sought, but failed, to secure a deal to be an exclusive distributor of the Pocket Monkey.  Appx4398-99.  Shlaferman and Dynamite's

this."). Shlaferman worked with LaErik Cooper, a mechanical engineer who operated a business working with inventors, to conceive the claimed design. Appx3; Appx4401. Their collaborative activities and Cooper's contributions are documented in the contemporaneous correspondence in addition to trial testimony. Appx4452-58; Appx5928-31. Among other contributions, Cooper introduced the placement and arrangement in a mound shape of the hex-shaped cutouts along an outer edge. Appx7.

Before the trial, *Shlaferman unilaterally contacted Cooper about joining as a co-inventor of the D'877 patent and to seek an assignment of Cooper's patent rights to Dynamite*. Appx4492-99; Appx4573-86; Appx5941-46 (Shlaferman e-mailing Cooper correction of inventorship and assignment documents). Failing to obtain this, Dynamite brought an action against Cooper and his company in the Middle District of Florida for a declaratory judgment regarding inventorship and ownership, which was transferred to the Eastern District of New York for consolidation with the case below. Appx45-46; Appx1163. In connection with the Florida litigation, Cooper contacted Sherman about the inventorship claims and gave Sherman a *nunc pro tunc* assignment of his ownership rights as an inventor of

---

predecessor company were sued by the maker of the Pocket Monkey for patent infringement regarding the Wallet Ninja. Appx5903-04.

the D'877 patent, for which Sherman compensated Cooper for his involvement in

the case.  Appx4586-88; Appx5730-37.

## II.    Sherman and the Accused Product

Sherman sold a multi-purpose tool, which has been designated as the TOL4,

TOL8, or S11171 product.  Appx5670; Appx5676-77.  In July 2017, Sherman

introduced an original version, which was sold until May or June 2018.[5]

Appx5086; Appx2502.  Upon receiving a cease-and-desist letter in March 2018

from Vante, Inc. asserting the D'877 patent, Sherman redesigned the product

(below) and started selling the new version to replace the original.  Appx5037-45.



The redesigned version of the TOL4 product has a series of hex-shaped

cutouts along its edge arranged in descending size order.  It also has features, such

as screwdrivers, a box opener, and a can opener, which are shaped, spaced, and

---

[5] Sherman is not disputing whether the original version infringes the D'877
patent.  Nevertheless, in the patent assignment dated May 18, 2018, Dynamite did
not receive the right to sue for past infringement from the prior owner, Vante Inc.,
which is not a party to this case.  Appx5664-66.

arranged differently from the elements in the design of the D'877 patent. Appx5041-42.

Sherman sold its tool in the promotional market for $1 or less per unit, while Dynamite's Wallet Ninja was sold primarily in the distinct retail market for approximately $4-$5 per unit and as high as $10 per unit. Appx4734; Appx4900-01; Appx5227.

## SUMMARY OF THE ARGUMENT

Sherman's argument has six principal parts:

1.      The district court's determination that Cooper is not a co-inventor of the D'877 patent should be overturned.  The court's submission of the inventorship claim to the jury was erroneous because there is no jury trial right on this issue.  Nevertheless, the jury's verdict on inventorship lacks substantial evidence and is contrary to the testimony and corroborating evidence presented at trial, including Shlaferman's admission that Cooper is a co-inventor.  The case should be dismissed for lack of standing as a matter of law if Cooper is determined to be a co-inventor.

2.      The jury's verdict on infringement should be set aside as contrary to the evidence presented at trial and for lack of substantial evidence, including that Dynamite's expert's testimony based on "gestalt principles" is insufficient.

3.      The jury's verdict on invalidity for functionality should be set aside as contrary to the evidence presented and for lack of substantial evidence, including lack of proof of alternative designs with the same or similar functional capabilities.

4.      The jury's verdict on invalidity for obviousness should be set aside as contrary to the evidence presented and for lack of substantial evidence.  Sherman presented an unrebutted case for obviousness.

5.    The jury's verdict on damages is erroneous and not supported by substantial evidence and is based on inadmissible evidence, including that Dynamite's claim for lost profits fails to prove the absence of acceptable non-infringing substitutes and demand for the patented product.

6.    The court's award of attorney's fees and other fees and costs should be set aside as erroneous and for abuse of discretion.  This award based on alleged litigation misconduct was unsupported and conflated the purposes of awarding attorney's fees under § 285 and enhanced damages under § 284.

# ARGUMENT

## I. Statement of the Standard of Review and Legal Standards for Issues Raised on Appeal

### A. Standard of Review

In evaluating the jury's verdict and JNOV motions, this Court determines whether the evidence "constitutes 'substantial evidence' in support of the jury's findings and, if so, whether those findings can support the legal conclusions necessarily drawn by the jury in accord with its instructions enroute to its verdict." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

This Court follows the regional circuit on non-patent-specific standards governing a motion for judgment as a matter of law and for a new trial as well as governing its review of the district court's denial of motions for same and the jury's verdict. *See Raytheon Co. v. Indigo Sys. Corp.*, 895 F.3d 1333, 1338 (Fed. Cir. 2018). Under Second Circuit law, the denial of a motion for judgment as a matter of law is reviewed *de novo*, "applying the same standards that guided the district court's consideration of the issue." *Nimely v. City of New York*, 414 F.3d 381, 389-90 (2d Cir. 2005). The Second Circuit will grant a motion for judgment as a matter of law "only if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on that issue.'" *Cameron v. City of New York*, 598 F.3d 50, 59 (2d Cir. 2010) (citation omitted); Fed. R. Civ. P. 50(a). Under Second Circuit law, denial of a new trial is reviewed for abuse of discretion,

in particular where the court has "(1) 'based its ruling on an erroneous view of the

law,' (2) made 'a clearly erroneous assessment of the evidence,' or (3) 'rendered a

decision that cannot be located within the range of permissible decisions.'"

*Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010).

### B.    Legal Standards for Issues on Appeal

### 1.    Inventorship and Standing

35 U.S.C. § 256 "grants district courts the power to correct . . . the omission

of an inventor in an issued patent." *Fina Tech., Inc. v. Ewen*, 265 F.3d 1325, 1327

(Fed. Cir. 2001). The Court applies the same standard of inventorship to design

patents as for utility patents. *Blue Gentian, LLC v. Tristar Prods., Inc*., 70 F.4th

1351, 1361 (Fed. Cir. 2023).

A party seeking correction of inventorship must show by clear and

convincing evidence that a joint inventor should have been listed. *Eli Lilly & Co.*

*v. Aradigm Corp*., 376 F.3d 1352, 1358 (Fed. Cir. 2004); *see Fina Oil & Chem.*

*Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("[T]o be a joint inventor, an

individual must make a contribution to the conception of the claimed invention that

is not insignificant in quality, when that contribution is measured against the

dimension of the full invention."); *Kimberly-Clark Corp. v. The Procter & Gamble*

*Distrib. Co., Inc.*, 973 F.2d 911, 917 (Fed. Cir. 1992) (contributions must arise

13

from "some element of joint behavior, such as collaboration or working under common direction" with the other inventor).

An alleged joint inventor "must supply evidence to corroborate his testimony" *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998). "Corroborating evidence may take many forms," including "contemporaneous documents" or physical evidence, "[c]ircumstantial evidence," and "oral testimony of someone other than the alleged inventor." *Id.* To determine whether testimony has been sufficiently corroborated, a "rule of reason" test is applied where "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001).

Inventorship is a question of law based on underlying facts. *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018). The Court reviews the district court's overall inventorship determination *de novo* and the court's underlying factfinding for clear error. *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co., Ltd.*, 964 F.3d 1365, 1370 (Fed. Cir. 2020).

Whether a party has standing to sue is a question of law that the Court reviews *de novo*. *Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1262-63 (Fed. Cir. 2007) (citing *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000)). If the asserted patentee did not have standing to maintain

14

an infringement action, then jurisdiction is not proper on appeal. *Id*. With respect

to standing, "[a]n action for infringement must join as plaintiffs all co-owners."

*Ethicon*, 135 F.3d at 1467-68; *Advanced Video Techs. LLC v. HTC Corp*., 879 F.3d

1314, 1319 (Fed. Cir. 2018).

### 2.    Non-Infringement

To determine whether a design patent is infringed, one must consider, "[i]f,

in the eye of an ordinary observer, giving such attention as a purchaser usually

gives, two designs are substantially the same, if the resemblance is such as to

deceive such an observer, inducing him to purchase one supposing it to be the

other." *Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 670 (Fed. Cir. 2008).

An "ordinary observer" is presumed to take into account all of the claimed design

elements in assessing the similarities between the accused product and the patented

design, not merely the elements that an expert seeks to declare as material. *See*

*Contessa Food Prods., Inc. v. Conagra, Inc*., 282 F.3d 1370 (Fed. Cir. 2002).

"[A]ll of the ornamental features illustrated in the figures must be considered in

evaluating design patent infringement." *Id*. at 1378.

### 3.    Invalidity

Patent invalidity must be shown by clear and convincing evidence. *Abbvie*

*Inc. v. Mathilda & Terrence Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366,

1372 (Fed. Cir. 2014).

### a.    Functionality

For a design to be protectable by a design patent, "the design must not be governed solely by function, i.e., that this is not the only possible form of the article that could perform this function." *Rosco, Inc. v. Mirror Lite Co*., 304 F.3d 1373, 1378 (Fed. Cir. 2002). A design patent is invalid if the design is "dictated by the utilitarian purpose of the article" or is primarily functional rather than ornamental. *High Point Design LLC v. Buyer's Direct, Inc*., 730 F.3d 1301, 1315 (Fed. Cir. 2013); *L.A. Gear, Inc. v. Thom McAn Shoe Co*., 988 F.2d 1117, 1123 (Fed. Cir. 1993); *Richardson v. Stanley Works, Inc*. 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).

### b.    Obviousness

In the design patent context, obviousness is addressed by determining whether a designer of ordinary skill would have combined teachings of the prior art to create "the same overall visual appearance as the claimed design." *Durling v. Spectrum Furniture Co*., 101 F.3d 100, 103 (Fed. Cir. 1996). This inquiry proceeds in two steps. First, before the trier of fact can combine prior art references, it must determine whether there exists a "primary reference," *i.e*., a single reference that creates "basically the same visual impression" as the claimed design. *Id*. Second, if a primary reference exists, the trier of fact must determine whether, using secondary references, an ordinary designer would have modified

16

the primary reference to create a design that has the same overall visual appearance as the claimed design.  *Id*.

### 4.    Damages

A patentee is entitled to recover "damages adequate to compensate for the infringement."  35 U.S.C. § 284; *see* 35 U.S.C. § 289 (additional remedy for infringement of design patent).  A determination of lost profits damages is based on the four-factor *Panduit* test, which requires the patent owner to prove: "(1) demand for the patented product; (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made."  *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978); *see Rosco, Inc. v. Mirror Lite Co*., 626 F. Supp. 2d 319, 330 (E.D.N.Y. 2009).

A damages award tried to a jury "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009).  When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on damages.  *Tingley Sys., Inc. v. Norse Sys., Inc*., 49 F.3d 93, 96 (2d Cir. 1995).  Alternatively, the court may grant remittitur to reduce an excessive verdict.  *Id*.; *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc*., 637 F.3d 1269, 1290 (Fed. Cir. 2011)

17

("[T]he district court did not abuse its discretion by reducing the jury's damages award to account for the lack of substantial evidence supporting lost profits damages" claimed in the case.).

### 5.    Attorney's Fees and Costs

A court may award reasonable attorney's fees in exceptional cases.  35 U.S.C. § 285.  "[A]n 'exceptional' case is one that stands out from other with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.  *Spineology, Inc. v. Wright Med. Tech., Inc*., 910 F.3d 1227, 1229 (Fed. Cir. 2018).  A finding of willful infringement does not mandate an award of attorney's fees, and an attorney's fees award is appropriate only in limited circumstances.  *McNeil-PPC, Inc. v. L. Perrigo Co*., 337 F.3d 1362, 1372 (Fed. Cir. 2003).  Attorney's fees awards are reviewed for abuse of discretion. *Spineology*, 910 F.3d at 1229.

## II.    The District Court's Determination That Cooper Is Not a Co-Inventor Should Be Overturned

### A.    The District Court's Submission of the Inventorship Claim to the Jury Was Erroneous For Lack of Jury Trial Right

The district court submitted the inventorship claim *to the jury* along with issues relating to ownership of the D'877 patent in the first phase of the bifurcated

trial.  Appx5; *see* Appx3486-87; Appx3533-34.  The court *erred* by submitting to the jury the inventorship claim, which is a matter of law for the court to decide.

The parties had brought a joint motion to bifurcate the trial and conduct a bench trial on the inventorship claim along with ownership issues, but the court denied the motion.  Appx2586-87; Appx54-55.  The court did not submit inventorship to an advisory jury under Fed. R. Civ. P. 39(c)(1), nor did the court have the consent of any party to try the inventorship claim to the jury pursuant to Fed. R. Civ. P. 39(c)(2).  This matter was raised by the parties' joint motion, the court's order denying same, and subsequent proceedings.[6]  *See* Fed. R. Civ. P. 46; Appx4688-89 (post-verdict JNOV request based on assertion that "issue of

---

[6] The parties not only filed the joint motion to bifurcate and for a bench trial, but also previously raised the issue to the court in two proposed pretrial orders, a pre-trial conference, and a motion *in limine*.  Appx2532-33 (proposed pretrial order with Dynamite's statement, "No party demanded a jury on the issues of inventorship and ownership of the '877 Patent," and request for court to hear these issues); Appx2554-55 (amended proposed pretrial order with joint request for bench trial on issues relating to inventorship and ownership); Appx1557 (explaining that "[i]nventorship is a question of law"); Appx5622 (both parties requesting bench trial on these issues); *see also* Appx50 (5/4/23 Text Order initially granting parties' request to schedule bench trial on inventorship and ownership issues).  The refusal to conduct a separate bench trial was based solely on the court's convenience and schedule, with no regard for § 256 or the Seventh Amendment.  Appx5637 ("[I]f I'm just shaving two days off the trial, I guess I would rather just give it all to the jury."); Appx5638-39 ("So I guess we're just going to stick with the September 11th date for a jury trial.  I'm going to eliminate doing a separate trial. . . . If something gets backed up, this is the case that will get cut.").

inventorship is a matter of law"); Appx3535-46 (JMOL motion on inventorship asserting same); Appx2676 (parties agreeing to reserve rights). At trial, the court also recognized Sherman's objection and lack of consent to submitting inventorship to the jury. Appx4650-51 (regarding jury charge on inventorship, court stated to defense counsel, "I know you don't want that charge at all, but it's there.").

The court's submission of inventorship to the jury was contrary to § 256 and controlling precedent. While Dynamite had a right to a jury trial with respect to legal issues (*e.g.*, infringement, invalidity, and damages), the court contravened the prescription of § 256 that inventorship be heard and decided by *the judge*.

As this Court explained in the seminal case, *Shum v. Intel Corp.*, 499 F.3d 1272 (Fed. Cir. 2007), no right to a jury trial attaches to an inventorship claim. *Id*. at 1277 ("[A]n action for correction of inventorship under § 256, standing alone, is an equitable claim to which no right to a jury trial attaches."). This general rule has a corollary that a § 256 inventorship claim co-pending with another legal claim, for which "commonality exists between the factual issues," should be tried to a jury to determine the facts regarding inventorship as well as the other legal claim. *Id*. at 1279 ("We thus conclude that commonality exists between the factual issues underlying the inventorship and fraud claims. While Shum would not be entitled to a jury trial on the § 256 inventorship claim standing alone, given the co-

pendency of the asserted fraud claim, a jury should determine the facts regarding inventorship."); *see id*. at 1277 (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962)).

Although the present case is factually distinct from *Shum* because it does not involve inventorship and fraud or another claim bearing common factual issues, its reasoning controls. *Here, there is no claim with underlying factual issues common to the inventorship claim*. The only other claim brought to trial involved infringement. As this Court made clear in *Shum*, *an infringement claim does not share common factual issues with an inventorship claim*. The Court explained:

> While a § 256 cause of action was the equitable claim at issue in *Ethicon* [135 F.3d 1456], this legal claim involved infringement. Unlike a claim for fraud that is premised on an allegation that the named inventor misrepresented that he was the sole inventor, *a claim for infringement does not share common factual issues with a claim for inventorship*. A claim for infringement requires factual determinations regarding whether an accused product falls within the scope of a claim. In contrast, as discussed above, an inventorship claim concerns the identity of the person(s) who conceived the invention.

*Shum*, 499 F.3d at 1278 (emphasis added). In addition, the issue of ownership is subsumed within an infringement claim because *ownership* is a jurisdictional requirement for an infringement claim, and lack of ownership is a defense to an infringement claim. 35 U.S.C. § 287; *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1293 (Fed. Cir. 2016) (citing *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003)).

21

In this case, given that there is no separate legal claim for which commonality of factual issues exists, the equitable inventorship claim should have been heard and decided *solely* by the judge in accordance with § 256 and this Court's precedents, and the submission of inventorship to the jury constitutes reversible error.  By failing to provide findings of facts and conclusions of law on the inventorship claim, the judge prevented meaningful appellate review.

This error requires reversal of the court's Judgment.  Because there was never a legally sufficient determination that Cooper was not a co-inventor, the issue of ownership of the D'877 patent is unresolved.  Appx3487.  Absent the determination that Dynamite owned the D'877 patent, the jury's subsequent findings on infringement, validity, and damages should be overturned.

If the Court were to remand the case, the district court would need to hear and decide the inventorship claim without a jury and then submit the case to the jury on infringement, including issues of ownership, standing, and estoppel. Nevertheless, a remand would be unnecessary because the jury's verdict on one or more of the case-dispositive issues of infringement, validity, and damages should be set aside, as set forth below.

**B.      The Jury's Verdict on Inventorship Should Be Set
Aside for Lack of Substantial Evidence**

If the Court were to proceed further, the Court should also reverse the jury's

verdict and the denial of the JMOL motion on inventorship because there was a

lack of substantial evidence.

The evidence adduced at trial does not *in any way* support a finding, and no

reasonable jury could have found, that Cooper was not a co-inventor of the design

of the D'877 patent.  All of the corroborative evidence introduced at trial compels

a conclusion that Cooper *is* a joint inventor.  Cooper made significant contributions

to the conception of the claimed invention, collaborated with and communicated

his contributions to Shlaferman at the time of the invention, and offered far more

than the current state of the art.  Cooper's inventive contributions include, *inter*

*alia*, the placement, arrangement, and relative sizes of the hex-shaped cutouts

along one edge of the claimed design. Appx4453-56; Appx4463-64; Appx4454-56;

Appx4463-64.

The court points to an illustration offered to show both Shlaferman's and

Cooper's contributions to the claimed design, *i.e.*, the solid line portions of the

D'877 patent (Appx6-7), all of which are reproduced below.



The court fails to mention that "Shlaferman's Drawing" and "Cooper's Design" as depicted above are the *only corroborating evidence* introduced at trial relating to whether Cooper made a contribution to the invention of the D'877 patent including "the placement and design of the hex-shaped design elements" (Appx7).[7]  The drawings show that Shlaferman's original concept sketch did not include hex-shaped cutouts along an outer edge, but rather an internal hole like that of the Pocket Monkey, while Cooper's subsequent drawing communicated to Shlaferman shows a series of hex-shaped cutouts along one edge in a mound shape, as claimed in the patent.

According to the court, Cooper and Shlaferman *collaborated* in developing the claimed design of the D'877 patent through "their iterative exchanges"

---

[7] The court's assertion that "the hex cutouts encompass the *only* example of an element contributed by Cooper" (Appx7 (emphasis in original)) is erroneous. Cooper contributed not only the hex-shaped cutouts, but also at least the inclusion and placement of the concave cutout and associated point on the left side of both "Cooper's Design" and the D'877 patent design, serving as a box cutter. Appx4453 (Cooper confirming his decision to include and place concave cutout); Appx5930; Appx5934; Appx5936-40 (initial "Cooper's Design" including this design feature, which remained in the patent and Wallet Ninja product).

(Appx7). The parties' correspondence shows that Shlaferman sought Cooper's assistance in designing the claimed invention and expressed surprise and delight with Cooper's contributions, which produced a significantly different ornamental appearance. Appx4356-57 (confirming that Shlaferman "ask[ed] to hear Mr. Cooper's ideas"); Appx5928 (Shlaferman: "Excited to see what you make."); Appx5930 ("Cooper's Design"); Appx5931 (Shlaferman: "Wow, this is some bad a** sh*t!!" Cooper: "Thanks!!!! I'm glad you like it. I decided to go another route and was unsure if you would like it.").

In light of the correspondence, the court's assertion that "the inclusion of the hex wrenches was *Shlaferman's* idea during their interactive exchanges" (Appx7; emphasis added) is incomplete, and Shlaferman's trial testimony cited by the court (Appx4414-15; Appx4444) shows the same.[8] The court recognized that Cooper made an ornamental contribution to the claimed design and conceded that Cooper contributed "the placement and size of the hex-shaped design elements." Appx7; Appx4485 (regarding "whether or not Mr. Cooper contributed a sufficient quantum to be an inventor," court stated, "I don't know what instruction you can come up with where the answer is not yes, he was").

---

[8] Without referring to any evidence of record, the court attempted to justify its conclusion by minimizing the significance of Cooper's contributions, which speak for themselves. Appx7 (characterizing counsel's argument as "Cooper can only be credited" with this contribution); Appx8 (referring to Cooper's "largely ornamental change to a single aspect to the device").

The court also erred by conflating the substantiality of Cooper's *contribution to the ornamental design* with the commercial value of the invention based on its functional features, stating (Appx8):

> Cooper's insistence that his largely ornamental change to a single aspect of this device can constitute a substantial contribution fundamentally misapprehends the nature of the item at issue in this case. The Wallet Ninja's packaging wraps the device in breathless superlatives hawking the fact that it encompasses "18 Tools in 1" and "fits in your wallet." Pl. Ex. 202 [Appx5918]. Thus, the invention's myriad functions drive its value, not the niceties of the appearance— or arguably even the utility—of a particular feature.

The commercial value of an invention does not dictate whether a contribution to the ornamental design is significant, but rather the significance of the contribution is measured against the entire design. *Fina Oil*, 123 F.3d at 1473 (Fed. Cir. 1997). The court improperly discounted "the niceties of the appearance," *i.e.*, the ornamentality, of the claimed design based on its perceived value of the invention instead of looking at the features of the overall ornamental design.

Contrary to the court's conclusion, Cooper's independent contribution to the design was *significant*. Appx4453-57 (Cooper describing features he contributed). Referring to "Cooper's Design" pictured above, Cooper explained that "he reordered the hex cutouts such that he 'made it look like a mound,' with the largest one in the center and the others in laterally descending size order." Appx8; Appx4455. The placement and size of the hex-shaped design elements are ornamentally important, as they form a large portion of the clamed invention as

26

represented by the solid lines of the D'877 patent figures. *See* pg. 23-27 *supra* (protected design limited to a few perimeter cutouts). Cooper's contribution to the claimed invention satisfies and exceeds the quality and quantum of inventive contribution necessary to qualify as a joint inventor. *Fina Oil*, 123 F.3d at 1473 ("The case law thus indicates that to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when the contribution is measured against the dimension of the full invention."). Further, no evidence introduced at trial indicates that Cooper's contribution did not offer more than the known state of the art. For example, the Pocket Monkey allegedly used as a starting point for the D'877 patent did not include the hex-shaped cutouts along the edge, as contributed by Cooper. Appx4401; Appx4438-39 (referencing Appx5922).

The circumstantial corroborating evidence supports Cooper's inventorship claim. Without solicitation from Cooper, *Shlaferman himself sought to correct the inventorship of the D'877 patent to add Cooper as a joint inventor*. Appx4573-74; Appx5941-46 (Shlaferman "agree[d] to change the inventorship of the '877 Patent to add Eric [*sic*] Cooper as a co-inventor."). Shlaferman *conceded* that he sent a declaration to correct inventorship and assignment papers to Cooper and that he sought to add Cooper as an inventor, which establishes that *Shlaferman was fully aware and admits that Cooper is a co-inventor*.

27

The hex-shaped cutouts arranged as a mound along one edge of the design of the D'877 patent constitutes one of the few and most significant elements of the claimed design. There is no evidence that this contribution emanated from any source other than Cooper. Thus, the trial record and corroborating evidence establish that Cooper made a substantial contribution to the claimed design. The jury's verdict and the court's denial of the JMOL motion on inventorship should be reversed, with the court addressing the remaining issues in the case, as set forth above on page 22.

Should this Court conclude, however, that Cooper is a co-inventor, the Court should reverse the denial of Sherman's JMOL motion and rule that Dynamite's lacked standing to have brought the action in the first place, resulting in dismissal of the case. Dynamite acknowledges that it does not own the necessary rights flowing from Cooper's co-inventorship and admits that Sherman is the owner of such rights through an assignment from Cooper. Appx994 (Dynamite's admission it had no executed written assignment from Cooper); Appx5941-46 (Shlaferman requesting Cooper as co-inventor provide his assignment to Dynamite); Appx3380 ("But Cooper assigned away any rights he may have to Sherman."); Appx5730-37 (Cooper-Sherman Agreement and Assignment). Accordingly, Dynamite lacked both prudential standing and constitutional standing under U.S. Const. art. III, § 2. Regarding prudential standing, Dynamite failed to "join as plaintiffs all co-owners"

of the D'877 patent. *Ethicon*, 135 F.3d at 1467-68; *see Adv. Video Techs.*, 879 F.

3d at 1319 ("[Plaintiff] does not have full ownership of the [subject] patent. [Co-

inventor/co-owner] is neither a party to the suits, nor has she consented to these

suits. [Plaintiff], therefore, has no standing to maintain its suit."); *Israel Bio-*

*Engineering*, 475 F.3d at 1264-65 ("Absent the voluntary joinder of all co-owners

of a patent, a co-owner acting alone will lack standing."). Cooper, as co-inventor,

was never joined to the action as a co-plaintiff,[9] and with his assignment to

Sherman, neither he nor Sherman could be so joined and the standing defect cannot

be cured.[10] With respect to constitutional standing, Dynamite did not and cannot

suffer a legally cognizable injury necessary for standing where Sherman is not an

"unauthorized party" but rather a co-owner having equal exclusionary rights to

Dynamite. *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264-67 (Fed.

Cir. 2010); *Induction Innovations, Inc. v. Pacholok*, No. 13-5102, 2014 U.S. Dist.

---

[9] Separately, Dynamite's efforts in April 2021 to obtain Cooper's
assignment could not retroactively confer standing as to the May 22, 2019 filing
date of the action. *Alps South, LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379 (Fed.
Cir. 2015) (dismissal required due to defect in standing, existing at case initiation,
for failure to name necessary co-plaintiff and despite executed *nunc pro tunc*
agreement between the parties).

[10] It would be unnecessary to remand to determine whether Cooper or
Sherman could be joined as a plaintiff. *Cf. Lone Star Silicon Innovations LLC v.
Nanya Tech. Corp.*, 925 F.3d 1225 (Fed. Cir. 2019).

LEXIS 137580, at *10-*11 (N.D. Ill. Sept. 30, 2014) (co-inventor/co-owner not an "*unauthorized* party") (emphasis in original).

## III.  The Jury's Verdict on Infringement Is Not Supported By Substantial Evidence

There is no substantial evidence introduced at trial to support the jury's verdict of infringement.  In addition to the claimed and accused designs being plainly dissimilar, the only probative evidence is on *non-infringement* and was introduced by *Sherman*.[11]  *See Egyptian Goddess*, 543 F.3d at 678 ("In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear 'substantially the same" to the ordinary observer . . . .").

Sherman's expert, Dr. Formosa, testified that he compared the claimed design of the D'877 patent with Sherman's accused redesigned TOL4 product,[12]

---

[11] Sherman's non-infringement arguments are directed to the accused product as redesigned.

[12] The court points to testimony of Dr. Formosa to allege that Sherman's expert could not tell the two products apart.  Appx4.  The cited testimony is not clear that Dr. Formosa was referring to the original and redesigned versions of the TOL4, but instead mentioned "two different versions of the TOL4."  Appx5202-03.  Dr. Formosa did not testify that the redesigned version of the accused device was a direct knockoff or clone of the Wallet Ninja.  Such a conclusion would be contrary to Dr. Formosa's extensive testimony about the differences between the patented and accused designs as set forth herein.

concluding that there are visible differences such that one would not confuse them. Appx5189-93.  Dynamite's cross-examination of Dr. Formosa did not diminish his testimony regarding non-infringement.  Appx5194-95; Appx5199-201.

Moreover, at trial, Sherman also sought to introduce testimony from its Director of Merchandising, Mr. Davila, as an expert, *inter alia*, on the identity and characteristics of the ordinary observer.  The court improperly excluded Davila's testimony on infringement because he was also a fact witness, which ruling formed the basis for Sherman's additional motion for a new trial on infringement. Appx3961-64.  *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) ("[D]ual testimony [as both expert and fact witness] is not objectionable in principle.").  The exclusion of Davila's testimony further precluded Dr. Formosa's testimony addressing the ordinary observer's characteristics of carefulness, deliberateness, and experience purchasing promotional products in concluding why the ordinary observer would not be deceived or confused. *Id*.  This provides another reason for the Court to overturn the Judgment and order a new trial, as the failure to elicit this testimony on a fundamental issue of non-infringement caused the jury to reach an erroneous result.

In contrast, the evidence proffered by Dynamite on infringement is the testimony of its expert, Professor Rake, who applied a so-called "gestalt principle"

in comparing the design of the D'877 patent and the accused product.[13]
Appx4849-54. Professor Rake conducted his infringement evaluation on the basis
of the "impression" formed by an observer about the design, allowing him to
*ignore* features of the claimed design. Appx4837-39; Appx4844 (Gestalt is "based
on a psychological principle that we perceive whole objects rather than isolated
bits . . . ."). Because he failed to follow the governing legal principles and
overlooked claimed design features, Professor Rake's testimony cannot constitute
substantial evidence to support the jury's verdict.

It has been found that proffered expert testimony directed to determining
substantial similarity from the perspective of an ordinary observer based on gestalt
principles is *insufficient*. *OraLabs, Inc. v. Kind Grp. LLC*, No. 13-00170, 2015
U.S. Dist. LEXIS 103864 (D. Colo. Aug. 7, 2015). The court in *OraLabs*
addressed proposed expert testimony closely analogous to Professor Rake's
testimony that a product design's overall "gestalt" consists of a subset of its
different design features and that, although there are differences between the
designs of the D'877 patent and the accused product, the differences would be
perceived as irrelevant. Appx4870-72. The *OraLabs* court explained (2015 U.S.
Dist. LEXIS 103864, at *9-*11) (internal citations omitted):

---

[13] At trial, Sherman properly objected to Professor Rake's proffered
testimony with respect to the identity of the ordinary observer. Appx4823-26.

OraLabs argues that Mr. Kapec's opinion applying gestalt principles to the Lip Revo and the '939 Patent should be excluded because his report includes no facts or data that support the conclusion that the gestalt effect would cause ordinary customers to "complete" the shape of the Lip Revo product.  The Court agrees.  Mr. Kapec opines that gestalt principles lead to the conclusion that, when a consumer is presented the Lip Revo, the ordinary observer will complete the hemisphere by rounding off the Lip Revo's flat product mound, thus creating an appearance substantially similar to the product mound of the '939 Patent.  In this regard, Mr. Kapec's testimony is not a statement of his views on the dominant features of the patented and accused designs, but rather an empirical conclusion presented as scientific fact.  *See id.*  ("Applying the principles of Gestalt . . . when a consumer is presented with the OraLabs Lip Revo lip balm . . . the mind's eye will 'complete' the shape of the hemisphere").  Mr. Kapec's conclusion lacks explanation or factual support.  This is insufficient.  There is no articulated reason why an ordinary observer would round off the Lip Revo's flattened product mound as opposed to, for instance, squaring it off like the cylindrical top of a stick lip balm product mound.

*See also Yeti Coolers, LLC v. RTIC Coolers, LLC*, No. 15-597, 2017 U.S. Dist. LEXIS 11956, at *7 n.2 (W.D. Tex. Jan. 29, 2017) (referring to expert in *OraLabs* as applying a "defunct legal standard").  The application of "gestalt theory" has recently been criticized:

Thurman's principal criticism of the surveys conducted by Lutron's experts appears to be that they lack expertise in "shape perception science," or modern Gestalt theory.  As far as I can tell, modern Gestalt theory as a way to evaluate consumer perception has passed *Daubert* muster in just one case in any federal court.  *Delta T, LLC v. Dan's Fan City, Inc.,* 2021 U.S. Dist. LEXIS 24422, 2021 WL 458022 (M.D. Fla. Feb. 9, 2021).  This court found a second such case in which the theory was employed by a proposed expert, but the court granted a Daubert motion and excluded the testimony for lack of reliability.  *See Oralabs* [above]. This track record does not inspire confidence in Dr. Thurman's criticism.

33

*Geigtech E. Bay LLC v. Lutron Elecs. Co.*, No. 18-5290, 2023 U.S. Dist. LEXIS 184989, at \*33-\*34 (S.D.N.Y. Sep. 20, 2023) (internal citations omitted).

In the present case, Professor Rake applied gestalt principles to blur the otherwise significant ornamental differences in the arrangements of the hex-shaped cutouts between the claimed and accused designs to reach the unsupportable conclusion that the designs are substantially similar.  Appx4871  ("For instance in this one, there's a row of little house shapes along an edge.  An eye would group those as a thing.  So instead of seeing a number of pieces, the eye is going to see in that part, they're going to see one thing.  So it's kind of a subset of the multiple.").  Significantly, Professor Rake provided no reason why an ordinary observer would view the "mound" arrangement of the hex-shaped cut-outs claimed in the D'877 patent to be the same as the arrangement decreasing in size from left to right in the accused product.

Professor Rake's "evidence" of infringement is skewed when examined under the substantial similarity standard set out in *Egyptian Goddess*.  543 F.3d at 670; *see id.* at 676 ("[W]hen the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer.").  For these reasons, Dynamite's only proffered testimony on infringement does not constitute sufficient evidence to support the jury's verdict.

34

The court also misconstrued the evidence of non-infringement introduced by Sherman and improperly compared the patented and accused designs in denying Sherman's JMOL motion.  Based on a comparative illustration of the claimed and accused designs (Appx14), the court characterized Sherman's expert's opinion distinguishing them as "unsupportable," with no reasoning.  The court admitted, however, that its own view as to any alleged similarity of the patented and accused designs is not relevant.  *Id*.  ("Even if one were to observe that, consistent with the maxim of *res ipsa loquitor*, the objects pictured above are exceedingly (and confusing) similar, that is not the question.").

Nevertheless, given that Sherman introduced proper evidence of non-infringement, confirmed by visual differences between the patented and accused designs, while Dynamite provided no competent evidence of infringement, this Court should overturn the jury's verdict and the court's denial of Sherman's JMOL motion for lack of substantial evidence and denial of Sherman's motion for a new trial.  Upon reversing the Judgment with respect to infringement, the permanent injunction entered by the court should also be set aside.

## IV.  The Jury's Verdict of No Functionality Is Not Supported By Substantial Evidence

This Court should reverse the jury's verdict and the trial court's denial of Sherman's JNOV motion of invalidity for functionality and the court's denial of Sherman's motion for a new trial because the jury's verdict on this issue was not

supported by substantial evidence.  In light of the evidence presented, no reasonable jury could have found that the claimed design of the D'877 patent was not primarily functional.  Dynamite provided no evidence of alternative designs that provide the same or similar functional capabilities as the claimed design, nor did it introduce any evidence as to non-functionality.

The instruction to the jury on the issue of invalidity for functionality focused on whether alternative designs existed (Appx5289):

> It is normal and expected therefore that claimed designs perform some sort of function, and that does not disqualify the design for design patent protection.  The question is whether those general functional characteristics can only be embodied in the claimed design or whether they can be embodied by other design[s], such that the claimed design is not the only way to perform those general functions.  Thus, the existence of alternate designs that perform substantially the same function may be strong evidence that the design at issue is not dictated solely by its function.

This instruction is consistent with the Court's precedent on evaluating functionality.  In particular, the "availability of alternative designs [is] an important—if not dispositive—factor in evaluating the legal functionality of a claimed design."  *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312 1329-30 (Fed. Cir. 2015) (claimed design functional where "the patentee presented no evidence of alternative compatible key blade designs").

Sherman's expert, Dr. Formosa, provided testimony on functionality with respect to the claimed design.  The witness examined the hex-shaped cutouts,

which are designed to work with hex-shaped nuts, on the *edge* of the claimed article.  Appx5165.  To show the functional nature of the hex-shaped cutouts, Dr. Formosa explained that these features of the design of the D'877 patent are *open* on one side, which is significant because this arrangement would allow the user to approach a hex-shaped nut from the side, in contrast to a tool having an *internal hole* such that the tool would have to be dropped *on top* of the hex-shaped nut. Appx5166.  Dr. Formosa also pointed to other functional features of the claimed design, including the box cutter, letter opener, and screwdriver.  Appx5166-69 (concluding that "[t]hey are all very standard utilitarian shapes" and "typical").  In light of this testimony, none of the designs or products referenced by Dr. Formosa at the trial are alternative designs that provide "the same or similar functional capabilities" as the claimed design, as would be required to avoid a finding of functionality.  *Ethicon Endo-Surgery*, 796 F.3d at 1331 (quoting *Rosco*, 304 F.3d at 1378).

An alternative design to that claimed in the D'877 patent would need to include *hex-shaped cutouts on one edge* for application to hex-shaped nuts *as well as additional multi-purpose tool features* such as a box cutter and letter opener. The design of the D'230 patent has hex-shaped openings on one side but does not have any of the other features of the claimed multi-purpose tool, such as the box cutter and letter opener.  Pg. 6 *supra*.  In contrast, other referenced multi-tool

37

products, including the Pocket Monkey, have features such as the box cutter and letter opener but have an internal hole that functions as a hex-wrench in a different functional manner than the hex-shaped openings of the claimed design. *Id*. Sherman's witnesses did not provide any evidence of an alternative design to that of the D'877 patent that would avoid a finding that the claimed design is primarily functional.

Dynamite failed to provide any evidence of alternative designs that provide the same or similar functional capabilities as the claimed design, or regarding the non-functionality of the claimed design. In fact, Dynamite's witnesses consistently argued against the existence of alternative designs by asserting that there were no acceptable non-infringing alternatives for purposes of its damages case. Appx4939-41; Appx4980-83; Section VI.A *infra*.

Upon being provided with alternative designs with the same or similar functional capabilities as the design of the D'877 patent, Dr. Formosa concluded that the claimed design was primarily functional. Appx5174 ("Q. Dr. Formosa, looking at the design image that is on the screen there, is it your opinion that this design is primarily functional? A. Yes. . . . There is nothing that I see in this patent that looks beyond its functional purpose. So as a whole, or element by element, everything I'm looking at is purely based on its functional needs."); Appx5170 ("Well, it helps also to look at the unit as a whole and how distinctive that is once

you put all the shapes together.  And the impression that I get from this, again, is that in its entirety it's a utilitarian object."); *see* pg. 23-24 *supra* (protected design consisting of several perimeter cutouts serving as tools).  Dynamite did not rebut Dr. Formosa's testimony on cross-examination and provided no contrary evidence as to non-functionality of its asserted design.  Appx5195-98 (Formosa cross-examination).  *Since the claimed design of the D'877 patent is dictated by its use, namely the tools shown on its surface, it cannot be the subject of a design patent.* *L.A. Gear*, 988 F.2d at 1123.  Without substantial evidence to support the jury's verdict, the Court should overturn the jury's verdict and the court's denial of Sherman's JNOV motion and motion for a new trial on the issue of functionality because the evidence shows that the D'877 patent is invalid as primarily functional.  *Richardson*, 597 F.3d at 1293-94 (patent for a design that is primarily functional rather than ornamental is invalid).

## V.    The Jury's Verdict of No Obviousness Is Not Supported By Substantial Evidence

At trial, Sherman presented testimony and evidence of obviousness of the claimed design of the D'877 patent.  Dynamite offered no evidence of non-obviousness and did not in any way rebut or diminish Sherman's obviousness evidence.  The court's denial of Sherman's JMOL motions for obviousness and for a new trial should be reversed because the jury's verdict on this issue is not

39

supported by substantial evidence.  In light of the evidence presented, no reasonable jury could have found that the claimed design was not obvious.

In performing his obviousness analysis, Sherman's expert, Dr. Formosa, testified that the D'230 patent is a primary reference within the scope of the *Durling* test such that the design characteristics of the claimed and prior designs are basically the same. Appx5184-85 ("It's a little tricky because probably what I would call primary is the one at the top left because those hex shapes are so visually prominent."  "Well, on the top left is a row of hex shapes very similar to what's along the bottom of the '877 patent.").  Dr. Formosa also discussed the ordinary designer and explained how, using secondary references, the designer would have modified the D'230 patent to create a design that has the same overall visual appearance as the claimed design, the protected scope of which is shown on pg. 24 *supra*.  Appx5182-84 (describing "person of ordinary skill in the art" and concluding, "So there are four sides to this perimeter.  What the designer or design team would do is say we can put this here.").  Using the demonstrative below (Appx3709), Dr. Formosa showed the designs of the D'230 patent, along with the other cited prior art including the Pocket Monkey patent, compared with the claimed design.  Appx5185-87; Appx6612-16 (CN203409706).  This evidence is directed to showing that an ordinary designer would have used the cited prior art references to modify the D'230 patent to create a design that has the same overall

visual appearance as that of the D'877 patent. *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1340 (Fed. Cir. 2019).



In response to the testimony proffered by Sherman, *Dynamite did not cross-examine Dr. Formosa on any point relevant to the obviousness analysis for design patents, including the disclosures of the cited prior art.* Appx5195. Dynamite's expert, Mr. Rake, did not offer any relevant or specific testimony directed to prior art references or the similarities/differences of the design features of the prior art compared to the claimed design. Appx4846 ("[I]f you look at just what that silhouette is of each of these prior art examples and compare it to the '877, you can see the '877 Patent just has a very different silhouette than what the prior art has."); Appx4865-66 (comparing an unspecified "thing that existed before" to the

actual design of the patent to assert that "[t]hey're similar kind of rectangular forms" and the "silhouettes look like, they're not similar.").

The only evidence introduced by Dynamite was directed to differences between the claimed and prior art designs based on their "silhouettes," which is insufficient to establish that the D'877 patent design is not obvious. Dynamite presented neither a rebuttal to Sherman's obviousness case nor substantial evidence to support the jury's verdict. For these reasons, the jury's verdict should be set aside for lack of substantial evidence.

Moreover, the same testimony provided by Dr. Formosa supports a finding of obviousness under the test articulated in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007), that the "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." To the extent the *Durling* standard is modified to a test corresponding or akin to *KSR* in connection with the Court's *en banc* consideration of *LKQ Corp. v. GM Glob. Tech. Ops. LLC*, No. 21-2348 (Fed. Cir. June 30, 2023) (granting *en banc* rehearing, in part, on whether *KSR* overrules or abrogates *Durling*), the case should be remanded for consideration of obviousness in light of such a new standard.

42

**VI.    The Jury's Verdict on Damages Is Not Supported By Substantial Evidence and Is Based on Inadmissible Evidence**

After the trial, Sherman filed a JNOV motion on the issue of damages for lack of substantial evidence and further requested remittitur or a new trial. Appx3622-34; *see* Appx4978-79 & Appx5230-31; *Tingley*, 49 F.3d at 96 (confirming that a court may grant remittitur to reduce an "excessive" verdict). The jury's verdict should be set aside because no reasonable jury could have awarded damages for patent infringement as were granted in this case.  As set out below, Dynamite's quantification of lost profits damages is speculative. Appx5214-19 (Sherman's damages expert, Mr. Eisgruber).

Dynamite sought damages *only* in the form of its lost profits, electing to forego presenting a case for damages in the form of reasonable royalty or Sherman's profits.  *See* 35 U.S.C. §§ 284, 289; Appx9 ("Plaintiff sought damages on a lost profit theory under 35 U.S.C. § 284"); Appx5257-58 (acknowledging lack of reasonable royalty as option for damages).  Having failed to proffer any other evidence, Dynamite cannot now claim damages other than its lost profits.  *See Hafco Foundry & Mach. Co. v. GMS Mine Repair & Maint., Inc.*, No. 15-16143, 2018 U.S. Dist. LEXIS 106291, at *15-*16 (S.D.W. Va. June 26, 2018) ("Where the record lacks any evidence of a reasonable royalty rate, the Federal Circuit has approved of awarding 'zero damages' because '[t]he statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists

even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute.'"); *Rosco*, 626 F. Supp. 2d at 332 ("When the patentee cannot provide sufficient evidence to establish lost profits, the Court determines a reasonable royalty taking into account the *Georgia-Pacific* factors, to the extent that there is evidence in the record.").

Proving lost profits damages hinges on a "but for" analysis, where Dynamite bears the burden to show that there was "a reasonable probability that, 'but for' the infringement, [Dynamite] would have made the sales that were made by the [Sherman]." *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 826 (Fed. Cir. 1989); *see also Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1356 (Fed. Cir. 1999) (articulating need for "reliable economic proof of the market that establishes an accurate context to project the likely results 'but for' the infringement."). Dynamite failed, however, to demonstrate, as a matter of law, that "but for" Sherman's sales of the purportedly infringing product, Dynamite would have made all of Sherman's sales. *Panduit*, 575 F.2d at 1156.

### A. There Is Insufficient Evidence on the Absence of Acceptable Non-Infringing Substitutes to Support the Jury's Verdict

"The second [*Panduit*] factor—the absence of non-infringing alternatives—considers demand for particular limitations or features of the claimed invention." *Group One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 74 (E.D.N.Y. 2022) (citing

*Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017)).

This factor "often proves the most difficult obstacle for patent holders." *Mentor*

*Graphics Corp.*, 851 F.3d at 1286. "[I]f the customer would have bought the

infringing product without the patented feature or with a different, non-infringing

alternative to the patented feature, then the patentee cannot establish entitlement to

lost profits for that particular sale." *Id.* Accordingly, the patentee must "take[]

into account any alternatives available to the infringer." *Grain Processing Corp.*,

185 F.3d at 1351. Critically, "market sales of an acceptable noninfringing

substitute often suffice alone to defeat a case for lost profits." *Id.* at 1352.

Pursuit of lost profit damages with respect to a *design* patent is particularly

problematic, as detailed in the seminal *Carpet Cases*, since there is no implicated

patented invention or feature but simply a claimed design. *See Dobson v. Hartford*

*Carpet Co.*, 114 U.S. 439, 445 (1885) ("A design or pattern in ornamentation or

shape appeals only to the taste through the eye, and is often a matter of evanescent

caprice. The article which embodies it is not necessarily or generally any more

serviceable or durable than an article for the same use having a different design or

pattern. Approval of the particular design or pattern may very well be one motive

for purchasing the article containing it, but the article must have intrinsic merits of

quality and structure, to obtain a purchaser, aside from the pattern or design.");

*Dobson v. Dornan*, 118 U.S. 10, 17-18 (1886) ("[T]here can be no presumption

45

that the plaintiffs would have sold their better quality of carpets in place of the defendants' poorer quality, if the latter had not existed, or that the pattern would have induced the purchasers from the defendants to give to the plaintiffs the higher price.  On the contrary, the presumption is at least equal that the cheaper price, and not the pattern, sold the defendants' carpets.").

Dynamite could not, and did not, adequately prove an absence of acceptable non-infringing substitutes.  Shlaferman explicitly shared his knowledge of acceptable non-infringing substitutes in his testimony.  Appx4398-99; Appx4911-12 ("Q. Have you seen more than ten [wallet-sized multi-tools] on the market before? A. Yes. Q. More than 50? A. It's hard to give a number to it.").[14]

Shlaferman's decision to develop his own multi-purpose tool, which later became the Wallet Ninja, came after he discovered the Pocket Monkey and after he failed to secure a deal to be an exclusive distributor of the Pocket Monkey. Appx4398-99.  Shlaferman and Dynamite's predecessor company were later sued by the maker of the Pocket Monkey for patent infringement upon introducing the Wallet Ninja.  Appx5903-04; *see Hafco*, 2018 U.S. Dist. LEXIS 106291, at *13-*14 (observing that, as the patent owner was involved in litigation with another

---

[14] "Wallet-sized" denotes a size sufficient to fit inside a wallet, namely the credit card slots therein; hence, the alternative use of "credit card-sized," which more accurately describes the relevant product dimensions.

46

competitor regarding the relevant products, there was not a two-supplier market and that acceptable non-infringing alternatives could exist).

During the trial, Sherman properly renewed its objection to the report and testimony of Dynamite's damages expert, Ms. Schenk, as deficient because of her lack of expertise in the promotional products market, her failure to conduct any independent analysis on the absence of non-infringing alternatives, her complete reliance on Shlaferman and other experts, and her speculative lost profits calculation; the court nevertheless permitted Schenk to testify despite these deficiencies.  Appx4783-84.  In addition to this Court's overturning the jury's verdict for its reliance on evidence that should have been excluded, the evidence provided by Schenk and Dynamite's witnesses is insufficient to support the damages claims.

When provided with Sherman's non-exhaustive list of acceptable non-infringing alternatives that she had purportedly previously reviewed, Schenk confirmed that she "did not look at each individual multi-tool that is laid out here." Appx1711-14.[15] Notably, Schenk could not agree to the basic statement that "in

_____

[15] As noted in Schenk's Reply Expert Report, additionally proffered non-infringing alternatives included Chinese Patent CN202174590 (bank card-like sized multi-purpose tool), U.S. Patent D707,091 (design patent directed to the Pocket Monkey), U.S. Patent D266,479 (multi-purpose tool), and the M48 Kommando Pocket Rescue Tool.  Appx6559-60; Appx6607-11; Appx6627. Schenk dismissed all of these solely due to the lack of "hex shapes open along the

this case, an example of an acceptable non-infringing alternative might be another multitool." Appx4980-81. She could not even articulate what a potential acceptable non-infringing substitute would look like, evasively responding that "[i]n this case, I was not able to find any [acceptable non-infringing substitutes] that were available on the market." Appx4981. A critical deficiency of Schenk's analysis is her disregard of not only the Pocket Monkey, but also alternative Wallet Ninja products that do not infringe the claimed design, particularly the subsequent Wallet Ninja Pro (reproduced below along with the original Wallet Ninja), on the basis that this product, despite its inclusion of those "hex shapes open along the edges" and Schenk's acknowledgment that "the Wallet Ninja Pro is not covered by the Patent-in-Suit," could not be considered an acceptable non-infringing substitute because of its "lack of imprint area" for promotional purposes. Appx6561. *See Rosco*, 626 F. Supp. 2d at 332 (party's sale of acceptable non-infringing substitute product, in addition to its product covered by a U.S. design patent, sufficient to defeat lost profits claim).

---

edges" (Appx6560), *which was a chief contribution of co-inventor Cooper to the claimed design*.

 

Schenk's testimony rings hollow due to her admission that she failed to seek out whether any such substitutes existed in the first place. Appx4988-90 ("I didn't go searching for alternative products"). Instead, as the basis for her opinion, she relied solely upon Shlaferman and Dynamite's additional expert, Mr. Bronson. Appx4990-91 ("I personally did not, so I relied on my discussions with Mr. Shlaferman, Mr. Bronson, to identify anything that they're aware of in the market that would have been available."). Shlaferman, however, testified that he also failed to search for acceptable non-infringing substitutes, admitting his lack of understanding of what is meant by this term. Appx4913 ("Q. Do you know what an acceptable noninfringing alternative is? A. No."); Appx4914-15. Moreover, both Shlaferman and Bronson could not confirm whether they reported to Schenk that no acceptable non-infringing alternatives to the Wallet Ninja were available. Appx4765 (Bronson: "I have no idea."); Appx4912-13 (Shlaferman: "I can't recall my conversation with her.").

Schenk's conclusions also run contrary to Shlaferman's testimony regarding the immense number of different available credit card-sized multi-tools on the

market. Appx4983 ("Q. And you're aware that there are possibly hundreds of different wallet-sized multitools available in the promotional products market, is that right? A. I think that may be consistent with Mr. Shlaferman's testimony from this morning. I can't remember if he said he knew it was a hundred wallet-sized or if it was a hundred more generally, but, if that's what he said, I have no reason to dispute."); *see also* Appx4398-99 (Shlaferman's knowledge and pursuit of the Pocket Monkey); Appx4911-12 (Shlaferman's acknowledgement of a plurality of wallet-sized multi-tools on the market). Schenk's regurgitation of the unsupported opinions of Shlaferman and Bronson constitutes deficient and inadmissible evidence. *See Pacific Life Ins. Co. v. The Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 115-16 (S.D.N.Y. 2021) ("[T]he Court will preclude proffered witnesses who simply aggregate or recite the opinions of others. . . . [A]n expert may not merely adopt another expert's opinions as his or her own reflectively and without understanding the materials or methods underlying the other expert's opinions."); *EZ Dock, Inc. v. Schafer Sys., Inc.*, No. 98-2364, 2003 U.S. Dist. LEXIS 3634, at *15-*17 (D. Minn. Mar. 8, 2003) (expert's reliance on another expert's testimony as evidence of a lack of non-infringing alternatives was insufficient to satisfy the second *Panduit* factor; "[Cobb] has deferred to Wortley's analysis and opinions."); *Finalrod IP, LLC v. Endurance Lift Sols., Inc.*, No. 20-00189, 2021 U.S. Dist. LEXIS 202681, at *6-*9 (E.D. Tex. Oct. 20, 2021) (precluding expert from

opining as to existence of acceptable non-infringing alternatives where expert relied upon conversation with another expert who failed to disclose underlying analysis/support).

In short, Dynamite and its experts inappropriately concluded that there was a lack of acceptable non-infringing alternatives, dismissing the Pocket Monkey, Dynamite's own non-infringing Wallet Ninja Pro, and the plurality of credit card-sized multi-tools disclosed by various experts. Appx5211-12 (Eisgruber testimony). Schenk's conclusions concerning acceptable non-infringing alternatives are defective due to her failure to review or compare potential alternatives and ignoring a portfolio of documented credit card-sized multi-tools, including those well-known to Dynamite.

Accordingly, Schenk's testimony cannot serve to support the jury's verdict. *See Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000) (inadmissible expert testimony cannot support verdict because it "contributes nothing to a 'legally sufficient evidentiary basis'").

### B.    There Is Insufficient Evidence on the Demand for the Patented Product to Support the Jury's Verdict

Dynamite's proffered evidence was similarly deficient with respect to the first *Panduit* factor – demand for the patented product. This is not only the result of its lack of proof, but also Dynamite's seeking lost profits for infringement of a *design* patent. Applying the reasoning of the *Carpet Cases* (pgs. 45-46 *supra*), it is

unclear how to differentiate demand for a product based on its protected design from the unprotected functional elements as well as other factors, including price. *See* Appx8 (The court finding that "the invention's *myriad functions drive its value*, not the niceties of the appearance—or arguably even the utility—of a particular feature.") (emphasis added).

Schenk again provided no independent analysis on this factor, instead relying on Bronson, who merely speculated to Schenk that the Wallet Ninja had a "cool factor" and became "hot" on this basis. Appx4993-94. Bronson failed to provide any substantiation for this claim, including conducting surveys, consumer interviews, and analyses quantifying the purported demand; in fact, Bronson contrarily testified that he did not recall telling Schenk that the Wallet Ninja was well-known. Appx4761-62. Bronson's "cool factor" alone does not suffice from an evidentiary standpoint. *See Oiness v. Walgreen Co.*, 88 F.3d 1025 (Fed. Cir. 1996) (reversal of a jury's verdict and subsequent award of lost profits due to damages expert's "rapt," "bald speculation"); *Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1576-77 (Fed. Cir. 1996) (plaintiff's damages expert report deemed to be "pure fantasy," and affirming grant of a new trial on damages).

Equally speculative is Schenk's unfounded conclusion that Dynamite would have captured *100%* of Sherman's sales, such determination not based on her own analysis but relying entirely on Bronson's unsupported opinions. *See, e.g.*,

Appx4931; Appx4759-65; Appx6428.[16]  As a result, Dynamite claimed lost profits

of approximately $1.9 million based on lost sales of approximately $2.8 million.

Appx4952-54.  This would constitute a non-credible profit margin of *68%*.  *See*

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 (Fed.

Cir. 1991) (affirming that lost profits should not be awarded because a "50% profit

margin" was "incredible," and thus the *Panduit* lost profits test could not be

satisfied).  These farcical numbers reflect Schenk's admission that they were based

on self-serving information provided by Shlaferman.  Appx4927; Appx4986-87;

*Pacific Life*, 571 F. Supp. 3d at 115-16 ("[T]he Court will preclude proffered

witnesses who simply aggregate or recite the opinions of others. . . "[A]n expert

may not merely adopt another expert's opinions as his or her own reflectively and

without understanding the materials or methods underlying the other expert's

opinions.").

       Made more egregious is Shlaferman's confirmation that he was unqualified

to provide such information, acknowledging he is "not an expert on the [relevant]

---

[16] As a separate matter, there is insufficient evidence that the third *Panduit* factor has been met, namely marketing capability/capacity to exploit demand. Schenk again relies on Shlaferman's unsupported claim that Dynamite "could have done it," despite Dynamite's acknowledgement that it has only "two employees." Appx5213-14 (Eisgruber: no evidence by Dynamite of "significant effort into their marketing direct to distributors."); Appx4880 ("I have one employee, Marsha May [*sic*], and her and I were able to just work together and keep up the demand of the product.").

market." Appx4906.[17]  Ultimately, Appellee's calculations and analysis are

impermissibly untethered to reliable data.  *DSU Med. Corp. v. JMS Co., Ltd.*, 471

F.3d 1293, 1309 (Fed. Cir. 2006) ("'To prevent the hypothetical from lapsing into

pure speculation, this court requires sound economic proof of the nature of the

market and likely outcomes with infringement out of the picture.' . . . Indeed, the

concept of sound economic proof requires some grounding in 'sound economic and

factual predicates.' . . . While damages analysis invariably involves hypothetical

reconstruction of a 'but for' marketplace, that reconstruction must include some

footing in economic principle, which the trial court found lacking.'") (citing *Grain

Processing Corp.*, 185 F.3d at 1350, and *Riles v. Shell Expl. Prod. Co.*, 298 F.3d

1302, 1311 (Fed. Cir. 2002)); *Oiness*, 88 F.3d at 1032 (reversing lost profits award

because plaintiff's damages expert "admits he did not conduct any market surveys"

in relevant market).

A fundamental, yet unsupported, assumption to Dynamite's damages claim

is that Sherman's customers would agree to pay somewhere between 3.1 and 6.5

times more per unit for the Wallet Ninja over Sherman's product (Appx6428),

---

[17] Shlaferman is not permitted to provide testimony on alleged lost profit damages when he is not qualified as an expert, which he freely admits. *Lambland, Inc. v. Heartland Biogas, LLC*, No. 22-1184, 2023 U.S. App. LEXIS 31726, at *22-*23 (10th Cir. Nov. 30, 2023) (vacating damages award because "the district court violated Federal Rule of Evidence 701(c) by allowing [plaintiff's executive] to give lay opinion testimony about [plaintiff's] projected profits.").

despite Sherman's products being sold in the promotional market and Dynamite's Wallet Ninja products being sold primarily in the retail market at a price point four times higher. Appx4734 ($1 vs. $4-$5 per unit); Appx4900-01 (Shlaferman's testimony on price disparity); Appx5002-04 (Schenk distinguishing promotional and retail markets); Appx5227 (Dynamite's counsel: "[Sherman] sell them for about a dollar."). The alleged support for this assumption was not data or evidence, but rather Bronson's broad statement that "customers are often willing to pay more for a unique and desirable product that enhances the perceived value of their brand." *Id.* This wide price disparity between the Wallet Ninja and the accused product weighs in Sherman's favor in the *Panduit* analysis. *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) ("The record in this case does not evince a reasonable probability that Windsurfing would have made its pro rata share of BIC's sales had BIC not been in the market. . . . BIC's [purchasing] customers demonstrated a preference for sailboards priced around $350, rather than [Windsurfing's] One-Design boards priced around $600. Therefore, without BIC in the market, BIC's customers would have likely sought boards in the same [lower] price range."); *Dornan*, 118 U.S. at 18 (1886) ("There was no satisfactory testimony that those who bought the cheap carpets from the defendants would have bought the higher priced ones from the plaintiffs. . ."); *see also* 7 CHISUM ON PATENTS § 20.05[2][e][vi] (2023) ("Evidence of causation has

been found insufficient when the infringer charged a significantly lower price than the patent owner.").

### C.    The Jury Charge and Jury Award Failed to Differentiate Between the Key Time Periods for Damages

As raised at trial (Appx5274-75), the jury charge did not account for the fact that Dynamite only received an assignment of the D'877 patent from prior patent owner Vante Inc. on *May 18, 2018*, which assignment failed to grant Dynamite the right to sue for past infringement. Appx5664-66; Appx4385-86. In light of this failure to include an express provision in the assignment conveying this right to Dynamite, Dynamite lacks the ability to recover for past infringement. *Arachnid, Inc. v. Merit Indus.*, 939 F.2d 1574, 1579 n.7 (Fed. Cir. 1991) ("The authorities are uniform that ['an assignment of a right of action for past infringements'] must be express, and cannot be inferred from an assignment of the patent itself."); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1367 (Fed. Cir. 2010) ("A party may sue for past infringement transpiring before it acquired legal title *if a written assignment expressly grants the party a right to do so*.") (emphasis added). Ultimately, Dynamite's damages analysis was based on, and included, sales predating May 18, 2018. Appx4943-44; Appx6418-19. Accordingly, the damages award for infringement of the D'877 patent improperly included damages concerning sales of Sherman's accused product occurring before May 18, 2018, with both the jury charge and its award failing to make such a distinction and

56

despite the court's "hope" that this issue would not "mean another trial." Appx5275.

Separately, the jury was insufficiently informed as to the division of damages among the original and redesigned versions of the accused Sherman product. As Sherman objected at trial (Appx5275-76), the jury charge failed to account for the multiple relevant time periods in this damages determination, particularly before and after Sherman began selling its redesigned product in place of its original product. Over Sherman's objection, the court permitted the conflation of two distinct products and their separate sales periods, as sought by Dynamite. Appx5275-76. This failure to appropriately articulate in the jury instructions the existence of different relevant time periods associated with the sale of Sherman's distinct products in the damages determination at a minimum warrants remand.

## VII. The District Court's Award of Attorney's Fees and Other Fees and Costs Should Be Set Aside

### A. The District Court's Findings Directed to Enhanced Damages Are Irrelevant and Inapplicable

After trial, Sherman brought a JMOL motion for no willfulness. The court denied Sherman's motion but also denied Dynamite's request for an award of enhanced damages under 35 U.S.C. § 284. Appx18 (court "declines to award enhanced damages"). In connection with Dynamite's motion for enhanced

damages, the court made findings regarding Sherman's alleged "bad conduct" (Appx15-16), all of which Sherman disputes.  Despite these findings, the court did not award enhanced damages to Dynamite.  The court awarded Dynamite attorney's fees *in place of* enhanced damages.  Appx18 ("Here, the amounts sought for attorneys' fees, expert fees and costs—totaling over $1.5 million plus interest—is roughly equivalent to an award of double damages, which here would amount to an additional $1.85 million.").  The court did not rely on either the jury's verdict on willfulness or its findings from the enhanced damages analysis in connection with the award of attorney's fees under 35 U.S.C. § 285.

### B.     Award of Attorney's Fees and Other Fees and Costs to Dynamite Should Be Set Aside As Erroneous and an Abuse of Discretion

Analyzing whether the action represents an "exceptional case" in light of Sherman's litigation conduct *only*, the court exercised its discretion to award attorney's fees to Dynamite under § 285.  Appx17-18 ("[T]he Court hereby awards the amounts sought as requested, which will compensate plaintiff for the costs of this protracted litigation while simultaneously serving the ameliorative purposes of an award of enhanced damages under § 284. … Thus, the Court hereby exercises its discretion to impose attorneys' fees, expert fees and costs.").[18]  The court's award of attorney's fees was erroneous and constituted an abuse of discretion.

---

[18] The court never concluded the case is "exceptional."

This Court set out the framework for a district court to award attorney's fees in *Rembrandt Techs., LP v. Comcast of Fla./Pa., LP*, 899 F.3d 1254, 1278-79 (Fed. Cir. 2018), as follows:

> Appellees do not dispute that attorney fees under § 285 are compensatory, not punitive. *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). In such a "statutory sanction regime[ ]," a "fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." … Deterrence "is not an appropriate consideration in determining the *amount* of a reasonable attorney fee." *Lumen View*, 811 F.3d at 484–85. It follows, as we have held, that "the amount of the award must bear some relation to the extent of the misconduct." *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003). We have explained that "[a] finding of exceptionality based on litigation misconduct[ ] . . . usually does not support a full award of attorneys' fees." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1316 (Fed. Cir. 2012), *vacated on other grounds*, —— U.S. —— –, 134 S. Ct. 1744, 188 L.Ed.2d 829 (2014). … The district court must explain that relationship, at least to the extent practicable.

The court failed to follow the Court's prescription in *Rembrandt*. Significantly, the court incorrectly conflated the purposes of enhanced damages under § 284 and attorney's fees under § 285, awarding attorney's fees as punishment to Sherman rather than as compensation for Dynamite. *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011) (the analyses for enhanced damages and attorney's fees are separate). Since the court did not award enhanced damages under § 284—and thus specifically declined to address the punishment aspect—the award of attorney's fees for "simultaneously

serving the ameliorative purposes of an award of enhanced damages under § 284"

(Appx18) was contrary to law and constituted an abuse of discretion.[19]

The court's award of attorney's fees was not based on the jury's willfulness

finding,[20] but rather focused only on the alleged "unreasonable manner in which

the case was litigated," including that the case was "hard-fought."  Appx16-17.

The court's discussion of Sherman's purported unreasonable litigation conduct in

connection with the award of attorney's fees was cursory and unsupported

(Appx17):

> And defendants' approach to this case, which was (and remains)
> highly unreasonable, certainly justifies an award of attorneys' fees.
> For example, defendants unnecessarily multiplied the proceedings by
> bankrolling Cooper's inventorship claims, which bordered on
> frivolity.  Moreover, defendants['] continued adoption of
> unreasonable positions, several of which are cataloged herein, plainly,
> and unfairly, added unjustified layers of complexity and expense to
> the resolution of the case.

The court had no basis to conclude that Sherman's positions and defenses to

Dynamite's infringement claims, including those relating to non-infringement,

---

[19] The court's vague statement, "Plainly, defendants' conduct, both during the underlying infringement as well as the course of the litigation, satisfies the requisite for the shifting of attorneys' fees and other costs and justify the imposition of an award of enhanced damages" (Appx18) fails to *distinguish* between the bases for awarding or denying attorney's fees and enhanced damages.

[20] *Cf. SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1326 (Fed. Cir. 2021) ("In awarding fees, the district court also took into account 'the fact that the jury found that Cisco's infringement was willful.'").

invalidity, and incorrect inventorship, were baseless or frivolous.  The court's and

the jury's determinations adverse to Sherman do not make them so.  This case

involved several complex issues, none of which were resolved before trial despite

the parties' attempts.[21]  The court did not identify which, if any, of Sherman's

positions was unreasonable.  In addition, that the litigation was "hard-fought" does

not justify an award of attorney's fees.  *See Presidio Components, Inc. v. Am.*

*Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017).  Setting aside the

court's unsubstantiated and incorrect descriptions of Sherman's litigation conduct,

nothing about Sherman's approach to the case should be deemed unreasonable.[22]

Thus, the court's factual findings in connection with its award of attorney's fees

were clearly erroneous.

---

[21] The court refused to conduct a § 256 hearing on inventorship and to
decide legitimate pre-trial issues, such as motions *in limine* to exclude expert
testimony.  Appx54-55.  Moreover, as set forth above, the inventorship claim is
substantial, and Sherman's compensating Cooper for his involvement in this case
to obtain an assignment of the patent was reasonable and not unprecedented.  *See
Ethicon*, 135 F.3d at 1459 (defendant obtained a retroactive license from an
unnamed co-inventor, Choi, and "agreed to pay Choi contingent on its ultimate
ability to continue to practice and market the invention" pending the outcome of an
inventorship claim, with Choi agreeing to assist the defendant).

[22] In further contrast to the court's assertions about Sherman's approach to
this case, shortly before the trial, the court articulated its views that the conduct of
*both* parties was reasonable one day and unreasonable another. Appx5625-26 ("So
counsel, good work today and I think you all did a very fine job on the submissions
which allowed me to cut through this without a lot of additional expense and
delay."); Appx54 (asserting "[t]he parties have remained intransigent" in
connection with preparing the pre-trial order).

Significantly, the court failed to explain the basis for the amount of the attorney's fees award or the relationship of the amount of the award to the extent of the asserted misconduct. The court never found the case "exceptional," but nevertheless awarded attorney's fees based entirely on unidentified litigation misconduct by Sherman. Pursuant to its flawed analysis, the court tied the amount of the attorney's fees award to the quantum of damages awarded—not to the asserted litigation misconduct or any particular litigation activities. Appx18. Further, the court did not and could not explain, as this Court required in *Rembrandt*, the relationship between the amount of the award and the extent of the alleged misconduct, since such misconduct was *unspecified*.

Therefore, the court's award of attorney's fees to Dynamite is arbitrary and an abuse of discretion. Moreover, given the inadequacies tainting the attorney's fees award, the court's award of expert fees, costs, and pre-judgment interest (Appx17-18) should be overturned along with the award of attorney's fees.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons set forth herein, Sherman respectfully requests that the Court reverse the district court's Judgment. This Court should overturn the jury's verdict and the court's denials of the JNOV motions and motions for a new trial, as well as set aside the permanent injunction. This Court may reverse and rule that Cooper is a co-inventor, including dismissing the case for Dynamite's lack of standing, or

remand with instructions first to conduct a bench trial on the inventorship claim;
reverse and rule in Sherman's favor on the basis of one or more of non-
infringement by Sherman, invalidity for functionality and/or obviousness; and set
aside or reduce the award of damages, attorney's fees, and other fees and costs.

Respectfully submitted,

Dated: April 29, 2024

/s/ Jeffrey L. Snow
JEFFREY L. SNOW
JOSEPH V. MICALI
PRYOR CASHMAN LLP
Seven Times Square, 40th Floor
New York, New York 10036
(212) 421-4100
jsnow@pryorcashman.com
jmicali@pryorcashman.com

*Counsel for Defendants-Appellants*
*The WowLine, Inc., Sherman Specialty, Inc.,*
*and Sherman Specialty LLC*

# Addendum

**TABLE OF CONTENTS**
**ADDENDUM**

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 156 | Memorandum & Order | 12/01/2023 | Appx1 |
| 157 | Letter with attached Proposed Order for Permanent Injunction | 12/13/2023 | Appx20 |
| 162 | Judgment | 01/22/2024 | Appx23 |
| | United States Patent D751,877 | | Appx26 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DYNAMITE MARKETING, INC.,

                              Plaintiff,

                    -against-

THE WOWLINE INC., SHERMAN
SPECIALTY, INC., SHERMAN
SPECIALTY LLC,
WWW.SUPERIORPROMOS.COM,
WWW.4ALLPROMOS.CO,
UNKNOWN WEBSITES 1-10, VARIOUS
JOHN DOES 1-10, and UNKNOWN
ENTITIES 1-10,

                              Defendants.
-------------------------------------------------------------X

DYNAMITE MARKETING, INC.,

                              Plaintiff,

                    -against-

4TH DIMENSION INNOVATIONS, INC.,
by and through its former officer, LAERIK
COOPER, and LAERIK COOPER, individually,

                              Defendants.


-------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

**FILED**
**CLERK**

3:55 pm, Dec 01, 2023

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM &**
**ORDER**
CV 19-3067 (GRB)(AYS)

1

Appx1

In *The Honeymooners*, a 1950s television sitcom, lead characters Ralph Kramden (Jackie Gleason) and Ed Norton (Art Carney) endeavored to film an infomercial for an all-purpose contraption called the "Handy Housewife Helper" that purportedly could open bottles and cans, tighten screws, scale fish, cut glass, sharpen scissors and knives, grate cheese, remove corns and famously "core a apple." The duo endeavored to market this item with the goal of generating $2,000 in revenue. Predictably (and amusingly), the plan met with disastrous failure.



This case involves a design patent dispute over another multi-purpose tool, known as the "Wallet Ninja."  Like its sitcom predecessor, the credit card-sized Wallet Ninja claims to embody a broad panoply of functions, including opening cans and bottles and tightening screws. Unlike the "Handy Housewife Helper," the Wallet Ninja proved wildly successful, generating millions in revenue.  And with this success came an unwanted side effect: the defendants knocked off the device, leading a jury, following careful consideration of the evidence presented at trial, to uphold the validity of plaintiff's design patent (USD751,877 ("'877")), find that defendants willfully infringed that patent and award plaintiff $1.85 million in compensatory damages.  DE 127.  That verdict followed on the heels of the jury's initial determination that the claims to inventorship by defendant LaErik Cooper—a putative coinventor whose claims were subsidized and championed by Sherman to torpedo Dynamite's patent claims—lacked substance, as Cooper failed to prove that he had made substantial contribution to the '877 patent.  DE 124.

Appx2

Presently at issue are a phalanx of post-trial motions by the parties.  Defendants attack the

verdict on several fronts, seeking judgment as a matter of law, a new trial and/or remittitur on the

issues of inventorship, damages, standing, validity, infringement and willfulness.  Plaintiff seeks

enhanced damages and attorney's fees.  For the reasons that follow, defendants' motions are

DENIED in their entirety, and plaintiff's motion is GRANTED IN PART.

**Background**

During the trial, the parties developed an extensive factual record, which is only

summarized here as background for the pending motions.

Around 2003, Alex Shlaferman, Dynamite's principal, devised the concept of the Wallet

Ninja, setting out to design a multitool that he could market.  He drew a rough outline on a

whiteboard, sending that drawing and other information to defendant Cooper.  Tr. 67-69.

Cooper, a mechanical engineer, operated a business that offered to create mechanical drawings

for inventors.  His website boasted a commitment to protecting the rights of inventors, including

the phrase "Helping to Engineer Your Ideas" in its logo, and representing that "Your ideas

remain just that, your ideas."  Tr. 295; DE 139 at 6; Pl. Ex. 6.  Shlaferman paid him hourly to

produce various drawings for the Wallet Ninja and several other projects.  Tr. 280.  Cooper

provided drawings that he helped create under this arrangement to Shlaferman's patent lawyer.

Tr. 290.  In 2014, Shlaferman filed for a design patent protecting certain features of the device,

which was granted in 2016.  Tr. 99, 293.

The Wallet Ninja enjoyed remarkable market success, being distributed through major

retailers and obtaining significant rankings on Amazon.com.  Tr. 563, 566, 644.  In 2017,

defendant Davila, on behalf of the Sherman defendants, sent a catalog photo of the device to

three producers in China seeking bids for supply.[1]  Tr. 541, 735–37; Def. Ex. 150–52.  The Sherman defendants began selling a knockoff that they acknowledge infringes plaintiff's patent; even after learning of the infringement, the group continued to sell through the inventory of the items they commissioned.  Tr. 736–78.  After receiving a 2018 cease and desist letter from plaintiff, Pl. Ex. 119, defendants "redesigned" the product—without making any meaningful changes[2]—and continued to sell the product unabated.  Tr. 739.  In fact, defendants' design expert deemed the replacement product "pretty identical" to its first version, also characterizing the new design as "a direct knockoff [or] a direct cloning" of the original design, leading to testimonial confusion between the two items.  Tr. 821–23.  Defendants created a blatantly false letter designed to reassure customers that their new design did not infringe plaintiff's patent.  Def. Ex. 183.  Overall, the various iterations of the knockoff proved the bestselling tool marketed by the Sherman defendants, and the group distributed approximately 800,000 units.  Tr. 740, 759.

        After the filing of this litigation, the Sherman defendants obtained an assignment of Cooper's rights as a putative inventor,[3] trying to invoke a standing doctrine that requires the consent of all inventors to proceed with patent litigation.  *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998); *Advanced Video Technologies LLC v. HTC Corporation*, 879 F.3d 1314 (Fed. Cir. 2018).  The Sherman defendants paid Cooper's legal fees and all related expenses.  Tr. 302–03, 757.  Such payment represented a *quid pro quo* for assignment of

---

[1] It's not clear whether defendants were aware at that time that the device was patented.  Though admittedly familiar with intellectual property issues, they did no due diligence.  In time, the testimony revealed, they would unquestionably learn of the patent through the receipt of a cease and desist letter from plaintiff.  Their behavior became, if anything, demonstrably worse.

[2] *Compare, e.g.*, Def. Ex. 173 at 62, *with* Def. Ex. 174 at 86.

[3] Prior to the commencement of trial, the Court raised the validity of Cooper's *nunc pro tunc* assignment of his rights, if any, to the invention to Sherman.  DE 114-1.  The jury's determination concerning Cooper's claims mooted these concerns.

the rights he might have held in the patent.  Tr. 277.  In a bifurcated trial, the jury first

determined that Cooper was not an inventor, and then proceeded to determine infringement,

invalidity and damages.  The jury's findings, contained in two verdict forms, establish that

Cooper failed to prove that he had made significant contributions to the claimed design of the

'877 patent; that the '877 patent was not invalid either on the basis of obviousness or lack of

ornamentality; the defendants infringed the '877 patent; that the infringement was willful; and

that plaintiff proved damages in the amount of $1.85 million.  DE 124; DE 127.  These motions

follow.

**Discussion**

*Applicable Standard for Post-Verdict Motions*

A post-verdict motion under Fed. R. Civ. P. 50(b) for judgment as a matter of law in this

Court is decided under the decisional authority of the Court of Appeals for the Second Circuit.

DE 135 at 3; DE 140 at 4.  Thus, defendants' motions seeking judgment as a matter of law, a

new trial and remittitur are decided based upon the well-established standard for the

consideration of such motions in this Circuit as discussed in detail in *Anderson v. Aparicio*, 25 F.

Supp. 3d 303 (E.D.N.Y. 2014), *aff'd and remanded sub nom. Anderson v. Cty. of Suffolk,* 621 F.

App'x 54 (2d Cir. 2015), which discussion is hereby incorporated by reference.

Against this backdrop, defendants' motions are easily dispatched.

*1.  Cooper's Inventorship Claims and the Issue of Standing*

Defendant Cooper contends that, based on the strength of his purported showing, that no

reasonable jury could determine that he did not make substantial contributions to the claimed

invention, rendering him a joint inventor of the design contained in the '877 patent.  There are

many problems with counsel's argument; perhaps the most fundamental is the graphic strawman

presented in its brief.  In its effort to contrast what it characterizes as "Shlaferman's minimal input" in the creation of the Wallet Ninja to Cooper's so-called contributions, counsel presents the Court with the following illustration:



DE 128 at 7.  While such sophistry—masked as artistic license—might prove persuasive to someone who did not attend the trial, anyone who paid the slightest attention would quickly recognize this as misdirection.  As the record makes abundantly clear, the '877 patent, which contains illustrations (like '877's Fig. 2 below) that resemble the finished product, only makes claims to limited portions of the outline of the device, as depicted:





*The Claimed "Solid Line" Areas*

6

Thus, the correct comparison for these purposes is not between Shlaferman's whiteboard design and the manufactured product; a fairer comparison lies between the whiteboard and the design protected by the patent:





*Claimed "Solid Line" Areas*

Viewed this way, the differences between Shlaferman's initial concept and the final patented design do not seem quite so significant, and counsel's presentation treads perilously close to an attempt to mislead the Court.

And the analysis does not end there. In itemizing Cooper's comparative contributions to the Wallet Ninja, counsel notes that "[a]s just one example, Shlaferman's design above did not include the hex-shaped cutouts at the bottom of the Wallet Ninja." DE 128 at 7. First, the hex cutouts encompass the *only* example of an element contributed by Cooper. More importantly, however, as the evidence makes clear, the inclusion of hex wrenches was Shlaferman's idea during their iterative exchanges. Tr. 134–35, 164. Cooper can only be credited, as counsel later clarifies, with "the placement and size of the hex-shaped design elements." DE 128 at 9. Thus, far from making a clear and convincing showing of inventorship, Cooper's contributions to the

7

patented design could best be described as incidental.

In fact, Cooper's claim that the positioning of the hex nut cutouts constituted a "significant contribution" finds little support in the record, and is subject to conflicting testimony. According to Cooper, he reordered the hex cutouts such that he "made it look like a mound," with the largest one in the center and the others in bilaterally descending size order. Tr. 175. Cooper claimed that this arrangement not only offered improved functionality by increasing the torque for the larger nuts,[4] but offered his view that such an arrangement made the tool more aesthetically pleasing. Tr. 174–75. The aesthetic assertion is contradicted by testimony from the Sherman defendants that, in creating one iteration of their knockoff, the cutouts were "reorientat[ed] to go from smallest to largest," which they deemed the "proper order," causing the tool to appear "like, a ratchet set [in which] you have a small bit going up to the largest bit." Tr. 698. Cooper's insistence that his largely ornamental change to a single aspect of this device can constitute a substantial contribution fundamentally misapprehends the nature of the item at issue in this case. The Wallet Ninja's packaging wraps the device in breathless superlatives hawking the fact that it encompasses "18 Tools in 1" and "fits in your wallet." Pl. Ex. 202. Thus, the invention's myriad functions drive its value, not the niceties of the appearance—or arguably even the utility—of a particular feature.[5]

On this motion, plaintiff urges the Court to apply the doctrine of equitable estoppel as to Cooper's inventorship claims under *MCV Inc. v. King Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989), citing an array of facts in support of such application. These facts include Cooper's

---

[4] Notably, "a design may contain both functional and ornamental elements, even though the scope of a design patent claim must be limited to the ornamental aspects of the design." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016).

[5] This aspect of the case is again reminiscent of the attempt to market the Handy Housewife Helper on *The Honeymooners*. During the filming of the show (which was broadcast live), the prop malfunctioned, unexpectedly springing a fragment of metal through the air. Covering the gaffe, Gleason improvised. "Maybe we ought to say something about spear fishing," he quipped.

general knowledge of the patent process, his specific knowledge of Shlaferman's efforts to patent the Wallet Ninja design, his promises to respect Shlaferman's inventive ideas, his request to Shlaferman to use pictures of the Wallet Ninja on his company's website and his inexplicable silence about inventorship for years after the application for and issuance of the patent.  DE 139 at 12.  Considering the jury's verdict, the Court need not reach the issue of estoppel.  However, these facts equally support the jury's finding that Cooper was not a co-inventor and further doom defendants' motion.

Finally, the Court agrees with plaintiff counsel's characterization that Cooper dissembled on cross-examination.  For example, he resisted admitting that he had never made a claim of inventorship or assigned rights as to any projects that he had helped design for customers other than Shlaferman.  Tr. 288–89.  At one point, he made a hollow, unsustainable claim that, in terms of being named as an inventor on the '877 patent, "I thought I was on it."  Tr. 291.  His testimony, combined with elements of demeanor that do not appear on the cold record, further support the jury's findings on this issue.

Thus, the jury's determination cannot, under any circumstances, be described as irrational or unlawful, and the Court will not disturb the jury's considered finding on inventorship.  Thus, defendants' motion for judgment as a matter of law is denied.  This determination also resolves defendants' motion on the issue of standing, which was expressly conditioned upon a finding of co-inventorship.  *See generally* DE 134.

  *2. Sherman Defendants' Motions regarding Damages*

Moving under Fed. R. Civ. P. 50(b), defendants seek reduction of damages via a new trial and/or remittitur, claiming that the jury's award was irrational and excessive.  Plaintiff sought damages on a lost profit theory under 35 U.S.C. § 284, while defendants argued that their profits

from the infringement represented a more reliable measure of damages.  At the outset, in their

papers, defendants attempt to mischaracterize the jury's determination.  Counsel asserts that

"[p]laintiff argued that it was entitled to lost profits of approximately $1.9 million based on lost

sales of approximately $2.8 million," which somehow morphs into "speculation that resulted in

lost profits of over $1.8 million, which the jury apparently accepted." DE 133 at 9, 11.  These

assertions greatly oversimplify and mischaracterize the evidence before the jury.  At trial,

plaintiff introduced testimony through its expert, Schenk, that plaintiff sustained lost profits in

the amount of approximately $1.9 million from lost sales plus another $200,000 in price erosion,

totaling approximately $2.1 million.  Tr. 611–12.  In addition, Ms. Schenk's report was admitted

into evidence without objection by defendants.  Tr. 624.  In that report, she presents three

different estimates of plaintiff's lost profits depending on the selling price employed for the

calculation, which estimates totaled approximately $1 million, $1.4 million and $2.5 million.  Pl.

Ex. 110 at Tabs 5-7.  At no point, then, did the jury simply accept figures from plaintiff's expert;

rather, the determination by the jury represents a reasoned, independent determination of the lost

profits sustained by plaintiff, for which there was ample support in the record.

      Perhaps more troubling is defense counsel's misconstruction of its own evidence.  In the

brief, counsel repeatedly and vehemently argues that it introduced evidence that defendants'

profits from the infringing activity totaled $150,000, and that the Court should use this figure in

evaluating the true scope of the loss.  DE 133 at 3 (request to "reduce the amount of damages to

$150,000"); *id.* at 11 (verdict "fails in the face of competent evidence that the *actual* profits

Defendants realized from sales of the accused product were approximately $150,000" and

"Defendants only had a profit of $150,000"); *id.* at 12 ("$150,000 [constitutes] the profits that

Defendants *actually* realized from sales of the accused product, because that is the only

competent evidence of damages that was presented to the jury").

The problem with this assertion is that it is simply untrue. Despite these repeated invocations of $150,000 as the profits obtained from the infringement, the only reference offered by defendants are two pages of the transcript—635 and 636—that contain testimony by plaintiff's expert about her best recollection of information provided by defendants' expert about defendants' illicit profits. In truth, defense counsel elicited testimony from their expert that the profits earned by defendants through their unlawful infringing activities amounted to $390,000, a figure more than two and a half times that fervently cited by defendants' counsel. Tr. 849–50. In response, plaintiff's counsel properly explained the shortcoming of this argument. DE 141 at 14-15; *cf.* Tr. 857–58 (plaintiff's counsel arguing to jury that there was no evidence to support $150,000 in ill-gotten gains). In its reply brief, defense counsel has the unmitigated *chutzpah* to maintain its position and make the following argument:

> Dynamite argues that Sherman's actual profit figure of approximately $150,000 was inadequately supported by the evidence. *See id.* That figure is supported by admissions from Dynamite's expert Ms. Schenk (T635:21-636:3), and Dynamite does not argue that Sherman's profit figure is incorrect.

DE 146 at 8. Counsel's argument appears to be yet another attempt to distort the record and mislead the Court.

Defendants' substantive attack chiefly focuses on whether plaintiff's expert properly applied the first two of the four *Panduit* factors for establishing lost profits, to wit: (1) the existence of acceptable non-infringing alternatives and (2) the demand for the patented product in the marketplace. DE 133 at 4-8. Of course, these questions were presented to the jury, so the issue of whether plaintiff's expert properly analyzed these questions is of limited significance. There was substantial evidence of record of both marketplace demands and the absence of non-infringing alternatives.

Appx11

"Mere existence of a competing device does not make that device an acceptable substitute." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). This maxim applies with particular force in the context of design patent cases, which must focus on ornamental features, rather than utilitarian considerations. "To be deemed acceptable, the alleged acceptable noninfringing substitute must not [ ] possess characteristics significantly different from the patented product." *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991).

Perhaps the most powerful evidence of these matters—expressly relied upon by plaintiff's expert—emanates from defendants' conduct. From the outset, defendants sought to offer a product that precisely mimicked the patented features of the Wallet Ninja. More telling, however, are defendants' actions after being confronted with irrefutable information that they were infringing the '877 patent. Not only did defendants continue to sell through their inventory of infringing goods, but they engaged in a *faux* redesign process that yielded a product described by their own expert as a "direct knockoff" and a "direct cloning." Tr. 822. Plaintiff's expert proffered these actions as evidence of the absence of non-infringing alternatives in the marketplace, noting that had such a product been available, defendants would not have engaged in a sham redesign process. Tr. 597, 637–38. Thus, defendants' behavior demonstrates that the vein of consumer demand into which they tapped—ultimately selling approximately 800,000 infringing units—required a product with the patented features, and therefore, would not be satisfied with a non-infringing alternative.

Notably, defendants do not offer non-infringing alternatives on this motion, but merely argue that plaintiff's expert failed to properly consider such items and made the same argument to the jury. Tr. 866–67. The jury was then instructed—consistent with the parties' requests—

12

Appx12

that to recover lost profits, plaintiff was required to establish "that there were no acceptable non-infringing alternatives or if there were, that the plaintiff lost some sales as a result of the infringing activity." Tr. 921. Thus, the evidence supports a determination by the jury that there were no non-infringing alternatives or that plaintiff otherwise established lost sales. In a case such as this one, involving a low-cost, impulse-buy consumer item, the jury's determination in this regard should be afforded particular weight.

On this motion, defendants also attempt to resuscitate their failed *Daubert* motion generally challenging plaintiff's damages expert. DE 133 at 9. However, as this Court previously ruled, both Ms. Schenk's credentials and methodology were more than sufficient to meet the requisite standards for admissibility. Tr. 471–73. The Court afforded counsel ample opportunity to attack the weight that the jury should accord that testimony. Tr. 472. That their efforts failed does not provide a basis for post-judgment relief.

In short, the evidence amply supports the jury's considered determination of damages, and defendants have failed to satisfy the demanding standard for post-trial relief.

### 3. *Defendants' Motion Regarding Validity, Infringement and Willfulness*

Defendants' Post-Verdict Motion purportedly seeks a new trial or relief from the verdict on the grounds of validity, infringement[6] and willfulness under Rule 50(b). Actually, the motion embodies a sweeping attack on the verdict unconstrained by the law, evidence, common sense or the truth. This may be best exemplified by yet another graphic contained in counsel's brief, this

---

[6] Presumably in an effort to avoid the Court's page limits, defendants filed several separate motions seeking essentially the same relief. The height of this practice is embodied in a yet another motion for a new trial on infringement, this time based upon the Court's refusal to allow one of its principals, Robert Davila, a defendant chiefly responsible for the infringement established at trial, to testify as "an expert in the promotional products market" and "the ordinary observer." Tr. 718–22; DE 138. While on this motion defendants present some non-binding caselaw suggesting the Court has the discretion, with a great deal of care, to have permitted this testimony, counsel fails to note that at the time this application was presented, no such authority was offered. *See* Tr. 720–22. Furthermore, defendants have presented nothing to suggest that they were, in any manner, prejudiced by the determination. As such, the Court stands by its decision and the motion is denied.

one submitted in support of counsel's argument that no rational jury could have found infringement:



| '877 Patent | Accused Device |
|---|---|

DE 135 at 11.  In conjunction with this graphic (which materially distorts the patent diagram), counsel reiterates its expert's unsupportable opinion that "there's quite a bit of difference between these two so that the object on the right is not confused with the object on the left."  *Id.* at 12. Even if one were to observe that, consistent with the maxim of *res ipsa loquitor*, the objects depicted above are exceedingly (and confusingly) similar, that is not the question.  Nor is the fact that one of defendants' principals admitted that the accused device infringed plaintiff's patent.  Tr. 736–38.  The fact remains that this graphic, the referenced testimony and a sheaf of other evidence and arguments by counsel were presented to the jury, which quite reasonably found that the product infringed.  And that determination was supported by substantial evidence, including testimony by plaintiff's expert that the products were sufficiently similar so as to cause confusion.  Tr. 506–11. Evidence similarly supported the conclusion that the design was not solely functional.

The same holds true for defendants' attack upon the jury's validity determination.  While defense counsel relies exclusively upon its expert's opinion to suggest that the patent design was obvious when compared to the prior art, and therefore invalid, there was sufficient reason to

14

question these opinions, as well as other evidence of record, that amply supports the jury's determination. Moreover, to the extent the expert's obviousness analysis centered on using the patented device as a patchwork exemplar to stitch together pieces of prior art, such analyses are disfavored by the law. *See Grain Processing Corp. v. Am. Maize-Prod. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

The balance of defendants' "kitchen sink" motion requires little analysis. For example, counsel attempts to attack the jury's finding of willful infringement based, in part, on a purported good faith belief by the Sherman defendants that Cooper was a coinventor, but since Cooper's role was unknown to defendants until long after the infringing acts, even if true, the defense fails. Likewise, defendants' reliance on the ersatz redesign of its infringing product borders on frivolous. *See* DE 135 at 13. Finally, defendants' argument that the jury verdict form should have required the jury to find the dates of infringement is not only an exercise in irrelevance on this record, but ignores the fact that defendants never requested such an inquiry be made and failed to object to the jury form despite repeated opportunities to do so. Tr. 893–99.

For these reasons, defendants fail to satisfy the exacting standards to warrant judgment as a matter of law and/or a new trial, and the motions are denied.

*4. Plaintiff's Motion Regarding Enhanced Damages and Attorneys' Fees*

Given the determination that defendants willfully infringed, the Court retains the discretion to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Generally, the Supreme Court has held that such enhancement is appropriate where defendants engage in conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously

wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs.,*

*Inc.*, 579 U.S. 93, 103–04 (2016). The Federal Circuit has promulgated a non-exclusive list of

factors to help district courts analyze this question:

> (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) the closeness of the case, (6) the duration of defendant's misconduct, (7) remedial action by the defendant, (8) the defendant's motivation for harm, and (9) whether the defendant attempted to conceal its misconduct.

*Sunoco Partners Mktg. & Terminals v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir.

2022). The Court is not required to discuss these factors but should rather focus on "the

particular circumstances of the case." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,

875 F.3d 1369, 1382–83 (Fed. Cir. 2017). Nevertheless, most, if not all of these factors could

well support enhanced damages in this case. The jury's finding of willful infringement was

based on substantial evidence of a pattern of bad conduct on the part of defendants, including its

initial theft of plaintiff's patented design (which was, at a minimum, reckless), its failure to stop

selling its inventory of pirated goods after receipt of a cease and desist letter and its utterly

indefensible mock redesign process.

    In addition, pursuant to 35 U.S.C. § 285, should the Court determine that the action

represents an "exceptional case," it retains the discretion to award attorneys' fees. Perhaps

unsurprisingly, after years of heated (and costly) litigation in a manner that defendants' counsel

concedes was "hard-fought," DE 137 at 5, plaintiff seeks an award of enhanced damages and

attorneys' fees and costs. Plaintiff's counsel devotes considerable energy to recounting

defendants' conduct during the litigation—which was, at times, unacceptable. *See generally* DE

136. In considering an application for attorneys' fees, the Court may consider "the unreasonable

manner in which the case was litigated." *Spineology, Inc. v. Wright Med. Tech., Inc.*, 910 F.3d 1227, 1229 (Fed. Cir. 2018). And defendants' approach to this case, which was (and remains) highly unreasonable, certainly justifies an award of attorneys' fees. For example, defendants unnecessarily multiplied the proceedings by bankrolling Cooper's inventorship claims, which bordered on frivolity. Moreover, defendants continued adoption of unreasonable positions, several of which are cataloged herein, plainly, and unfairly, added unjustified layers of complexity and expense to the resolution of the case.

On this motion, plaintiff seeks attorneys' fees of $1,134,157.50; expert fees of $250,168.86; and costs of $152,317.91, which total $1,536,644.27. *See generally* DE 136. Importantly, in reviewing such requests, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So, trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *LCS Grp. LLC v. Shire LLC*, 383 F. Supp. 3d 274, 279 (S.D.N.Y. 2019) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). In addition, plaintiff seeks the discretionary imposition of prejudgment interest.[7] While opposing, in general, the imposition of such fees and costs, defendants quarrel with a few items, but mostly rely on a general assertion that the figures are unreasonable and insufficiently documented.[8] *See generally* DE 137. Few specifics are provided, other than an argument that expert fees are not generally recoverable under § 285,

---

[7] Relying upon *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001), defendants argue than an inordinate delay in commencing the action militates against the discretionary imposition of pre-judgment interest. *But see General Motors Corporation v. Devex Corporation*, 461 U.S. 648, 656–57 (1983) ("Prejudgment interest should ordinarily be awarded."). To avoid any question concerning the prejudice from delay, and difficulties that might arise from fixing a precise date of loss, the Court will impose pre-judgment interest at the U.S. Treasury rate from the date of the filing of this action.

[8] Based on the Court's familiarity with this matter, at a macro level, the amounts sought do not seem unreasonable given the length and complexity of these proceedings.

Appx17

though it remains within the Court's inherent powers to make such an award.  For the reasons that follow, the Court hereby awards the amounts sought as requested, which will compensate plaintiff for the costs of this protracted litigation while simultaneously serving the ameliorative purposes of an award of enhanced damages under § 284.

Plainly, defendants' conduct, both during the underlying infringement as well as the course of the litigation, satisfies the requisite for the shifting of attorneys' fees and other costs and justify the imposition of an award of enhanced damages.  The Supreme Court has characterized the imposition of enhanced damages as a "discretionary punishment" for "willful infringement."  *Halo Elecs., Inc.*, 579 U.S. at 104–05.  Traditionally, in other contexts, such punitive damages are frequently awarded in small multiples of the amount of compensatory damages, a factor that becomes important here.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581 (1996) (cataloging legislative provisions for double, triple or quadruple punitive damages).  Here, the amounts sought for attorneys' fees, expert fees and costs—totaling over $1.5 million plus interest—is roughly equivalent to an award of double damages, which here would amount to an additional $1.85 million.  Thus, the Court hereby exercises its discretion to impose attorneys' fees, expert fees and costs in the amount of $1,536,644.27 plus pre-judgment interest from the date of the filing of the complaint in this action and declines to award enhanced damages.

*Permanent Injunction*

Plaintiff seeks a permanent injunction against the Sherman defendants, who endeavor to assure the Court that such an injunction is moot as they claim to have discontinued their infringing activities.  The Court is unpersuaded that there is no ongoing risk, and therefore the motion for a permanent injunction against further infringement is GRANTED as to the Sherman defendants.  As to Cooper and other non-parties against whom plaintiff seeks a permanent

injunction, such motion is denied.

**Conclusion**

Based on the foregoing, defendants' motions for post-trial relief are DENIED in their entirety.  Plaintiff's motion for the award of fees, costs and enhanced damages is GRANTED to the extent described herein.  Plaintiff's motion for a permanent injunction against the Sherman defendants is GRANTED, but is DENIED as to all other parties.  Plaintiff shall submit an order, preferably upon consent, containing the terms of a proposed injunction forthwith.

The Clerk is directed to enter judgment consistent with this opinion and close the case.

Dated: Central Islip, New York
      December 1, 2023

                            /s/ Gary R. Brown
                            HONORABLE GARY R. BROWN
                            UNITED STATES DISTRICT JUDGE



Michael Cukor

**McGeary Cukor LLC**
1460 Broadway
New York NY 10036
Direct: (973) 339-7367 Fax: (973) 200-4845
mcukor@mcgearycukor.com

December 13, 2023

Hon. Gary R. Brown, U.S.D.J.
United States District Court
Eastern District of New York
Long Island Courthouse
Central Islip, NY 11722

**RE:**     **Dynamite Marketing, Inc. v. The WowLine, Inc., et al.**
          **2:19-cv-3067 (JMA) (AYS)**

          **<u>Proposed Order on Consent Re: Proposed Injunction</u>**

Dear Judge Brown:

Pursuant to your December 1, 2023 Order (Dkt. 156) Plaintiff, Dynamite Marketing, Inc. and Defendants, Sherman Specialty Inc.. and Sherman Specialty Inc. dba THE WOWLINE, have met and conferred and Plaintiff submits the attached Proposed Order without objection from Defendants.

                    Respectfully,

                    Michael Cukor

Cc:  All counsel via ECF

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<table>
<tr><td>

DYNAMITE MARKETING, INC.,

                Plaintiff,

    v.

SHERMAN SPECIALTY INC and SHERMAN SPECIALTY INC dba THE WOWLINE;

                Defendants.

</td><td>

Case No. **2:19-cv-3067 (GRB) (LGD)**

</td></tr>
</table>

**[Proposed] Order for Permanent Injunction**

This Court having conducted a jury trial in this matter, having found that Defendants infringed U.S. Patent No. D751,877 (the "D'877 Patent") under 35 U.S.C. § 271, having considered Plaintiff's application for a permanent injunction and Defendants' opposition thereto and the entire record herein; having concluded that Plaintiff has shown that permanent injunctive relief is appropriate for the reasons stated in the Court's Memorandum and Order of December 1, 2023 [Dkt 156] and for good cause shown:

IT IS HEREBY ORDERED THAT Defendants and their officers, agents, servants and employees, and all those persons or entities in active concert or participation with any of them who receive actual notice of this Order for Permanent Injunction by personal service otherwise are permanently enjoined from:

infringing U.S. Patent No. D751,877 (the "D'877 Patent") under 35 U.S.C. § 271 by making, using, selling, offering for sale, or importing products that are covered by the D'877 Patent, specifically products having part numbers TOL4, TOL8 or S11171 or any product that is no more than colorably different from the products found to infringe, during the term of the D'877 Patent.

SO ORDERED this __ day of December 2023

_____
HONORABLE GARY R. BROWN,
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
DYNAMITE MARKETING, INC.,

     Plaintiff,

  - against -             **JUDGMENT**
                CV 19-3067 (GRB) (AYS)
THE WOWLINE INC., SHERMAN SPECIALTY,
INC., SHERMAN SPECIALTY, LLC,
WWW.SUPERIORPROMOS.COM,
WWW.4ALLPROMOS.CO,
UNKNOWN WEBSITES 1-10, VARIOUS
JOHN DOES 1-10, and UNKNOW ENTITIES
1-10,

     Defendants.
----------------------------------------------------------X
DYNAMITE MARKETING, INC.,

     Plaintiff,

  - against -

4TH DIMENSION INNOVATIONS, INC.,
by and through its former officer, LAERIK
COOPER, and LAERIK COOPER, individually,

     Defendants.
----------------------------------------------------------X

   This case having been tried by a jury, and a verdict having been rendered on September

14, 2023, finding defendants' willfully infringed U.S. Patent D751,877 (the "D'877 Patent"), and

awarding plaintiff $1,850,000.00 in damages; and

   A Memorandum and Order of Honorable Gary R. Brown, United States District Judge,

having been filed on December 1, 2023; denying defendants' motions for post-trial relief in their

entirety; granting in part plaintiff's motion fees and damages; awarding plaintiff $1,536,644.27

in attorneys' fee, expert fees, and costs, plus prejudgment interest from the date of the filing of

the complaint (May 22, 2019) to the date of judgment, and the Clerk of Court having calculated

that amount to be $148,673.061; granting plaintiff's motion for a permanent injunction against

defendants Sherman Specialty, Inc., and Sherman Specialty, Inc., dba The Wowline ("the

Sherman Defendants"); and

An Order of Honorable Gary R. Brown, United States District Judge, having been filed

on December 19, 2023, so ordering the proposed injunction, permanently enjoining the Sherman

Defendants, and their officers, agents, servants, and employees, and all those persons or entities

in active concert or participation with any of whom receive actual notice of this Judgment, from

infringing the 'D'877 Patent under 35 U.S.C. § 271 by making, using, selling, offering for sale,

or importing products that are covered by the D'877 Patent, specifically products having part

numbers TOL4, TOL8, or S11171, or any product that is more that colorably different from the

products found to infringe during the term of the D'877 Patent; and respectfully directing the

Clerk of Court to enter judgment accordingly and close the case, it is

**ORDERED AND ADJUDGED** that Plaintiff Dynamite Marketing, Inc., is awarded

$1,850,000.00 in damages, $1,536,644.27 in attorneys' fee, expert fees, and costs, and

$148,673.062 in prejudgment interest for a total award of $3,535,317.33, plus post-judgment

interest pursuant to 28 U.S.C. § 1961(a) against the Sherman Defendants; that defendants'

motions for post-trial relief are denied in their entirety; and it is further

---

1 The December 1, 2023 Memorandum and Order awards pre-judgment interest from the date of
the filing of the complaint in this action.   After consultation with Judge Brown's chambers, it
was determined that prejudgment interest only applies to the jury award and should be calculated
using simple interest in accordance with the rates specified under 28 U.S.C. § 1961(a).   The
Clerk has calculated the average interest rate from May 22, 2019 to the date of judgment to be
2.07%.

**ORDERED AND ADJUDGED** that the Sherman Defendants, and their officers, agents, servants, and employees, and all those persons or entities in active concert or participation with any of whom receive actual notice of this Judgment, are permanently enjoined from infringing the "D'877 Patent under 35 U.S.C. § 271 by making, using, selling, offering for sale, or importing products that are covered by the 'D'877 Patent, specifically products having part numbers TOL4, TOL8, or S11171, or any product that is more that colorably different from the products found to infringe during the term of the 'D'877 Patent; and that this case is closed.

Dated: January 22, 2024
      Central Islip, New York

BRENNA B. MAHONEY
CLERK OF COURT

BY:  /S/ JAMES J. TORITTO
DEPUTY CLERK

Appx25



US00D751877S

(12) **United States Design Patent**        (10) **Patent No.:**        **US D751,877 S**

Shlaferman        (45) **Date of Patent:**    ** **Mar. 22, 2016**

(54) **WALLET CARD MULTI TOOL**

(71) Applicant: **Alex Shlaferman**, Brooklyn, NY (US)

(72) Inventor: **Alex Shlaferman**, Brooklyn, NY (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/483,224**

(22) Filed: **Feb. 26, 2014**

(51) **LOC (10) Cl.** .............................................. **08–05**
(52) **U.S. Cl.**
        USPC ............................................................... **D8/19**
(58) **Field of Classification Search**
        USPC .................. D8/16, 18, 19, 20, 105, 363, 366,
                                                D8/370–377, 380–382
        CPC ...... B25F 1/00; B25F 1/02; A45F 2200/0575;
                                                                G01B 5/18
        See application file for complete search history.

(56)                **References Cited**

                U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D33,779 S | * | 12/1900 | Medern et al. ............ D8/371 |
| D218,272 S | * | 8/1970 | Bothe .............................. D8/19 |
| D241,006 S | * | 8/1976 | Wallace ........................ D8/373 |
| D356,243 S | * | 3/1995 | Eckerman .................... D8/373 |
| D468,977 S | * | 1/2003 | Graff et al. .................... D8/19 |

| | | | |
|---|---|---|---|
| D528,880 S | * | 9/2006 | Belflower ...................... D8/16 |
| D666,883 S | * | 9/2012 | Howard et al. ............... D8/19 |
| D701,110 S | * | 3/2014 | Symons ........................ D8/373 |
| D707,091 S | * | 6/2014 | Barr ................................ D8/16 |
| D729,023 S | * | 5/2015 | Alho et al. ..................... D8/19 |
| D730,131 S | * | 5/2015 | Cornell ........................... D8/19 |
| D732,360 S | * | 6/2015 | Reeder ........................... D8/19 |

* cited by examiner

*Primary Examiner* — Robert M Spear
*Assistant Examiner* — Eliza Bennett-Hattan
(74) *Attorney, Agent, or Firm* — Michael J. Feigin, Esq.;
http://PatentLawNY.com

(57)                **CLAIM**
The ornamental design for a wallet card multi tool.

                **DESCRIPTION**

FIG. **1** shows a top plan view of the wallet card multi tool.
FIG. **2** shows a bottom plan view thereof.
FIG. **3** shows a bottom perspective view thereof; and,
FIG. **4** shows a top perspective view thereof.
The broken lines shown in the drawings illustrate portions of
a triple ring setting for illustration purposes only, and form no
part of the claimed design.

                **1 Claim, 4 Drawing Sheets**





FIG. 1



FIG. 2

Appx28



FIG. 3



FIG. 4

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2024-1523</u>

**Short Case Caption:** <u>Dynamite Marketing, Inc. v. The WowLine, Inc.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑    the filing has been prepared using a proportionally-spaced typeface and includes <u>13,983</u> words.

☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>04/29/2024</u>

Signature: <u>/s/ Jeffrey L. Snow</u>

Name: <u>Jeffrey L. Snow</u>